585 F.2d 625
 18 Fair Empl.Prac.Cas. 261, 18 Empl. Prac.
Dec. P 8657
Lucy SLEDGE et al., Individually and on behalf of all others
similarly situated, Appellees,
Textile Workers Union of America, AFL-CIO, CLC, Intervenor-Appellee,
v.
J. P. STEVENS & CO., INC., Appellants.
Lucy SLEDGE, Thomas Hawkins, Herman Jones, Mable Moody
Miles, Clara Purnell, Patricia Purnell, Luke
Phipps and Marie Robinson, Appellants,
and
Textile Workers Union of America, AFL-CIO, CLC, Intervenor-Appellee,
v.
J. P. STEVENS & CO., INC., Appellee.
Lucy M. SLEDGE et al., Individually and on behalf of all
others similarly situated, Appellants,
Textile Workers Union of America, AFL-CIO, CLC, Intervenor-Appellee,
v.
J. P. STEVENS & COMPANY, INC., Appellee.
 Nos. 76-1988, 76-2150 and 76-2303.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 16, 1977.
Decided Oct. 4, 1978.
 
 Whiteford S. Blakeney, Charlotte, N. C. (Blakeney, Alexander & Machen, Charlotte, N. C., on brief), for appellant in 76-1988 and for appellee in 76-2303.
 Richard T. Seymour, Washington, D. C. (T. T. Clayton, Clayton & Ballance, Warrenton, N. C., Richard B. Sobol, Washington, D. C., Jack Greenberg, O. Peter Sherwood, New York City, Julius L. Chambers, Chambers, Stein, Ferguson & Becton, Charlotte, N. C., on brief), for appellants in 76-2303.
 Jonathan R. Harkavy, Greensboro, N. C. (Smith, Patterson, Follin, Curtis & James, Greensboro, N. C., Arthur M. Goldberg, New York City, Amalgamated Clothing and Textile Workers Union, AFL-CIO on brief), for appellee in 76-1988 and 76-2150.
 Abner W. Sibal, Gen. Counsel, Joseph T. Eddins, Associate Gen. Counsel, Charles L. Reischel, Asst. Gen. Counsel, and Paul E. Mirengoff, Atty., Equal Employment Opportunity Commission, Washington, D. C., on brief, as amicus curiae.
 Before CRAVEN, Circuit Judge,* FIELD, Senior Circuit Judge, and WIDENER, Circuit Judge.
 FIELD, Senior Circuit Judge:
 
 
 1
 An across-the-board assault upon the employment practices of the J. P. Stevens & Company, Inc., was initiated on October 2, 1970, when thirteen black residents of North Carolina filed this action seeking individual and class relief against the company.[1] The individual plaintiffs, past and present employees of J. P. Stevens' Roanoke Rapids, North Carolina, operations, as well as unsuccessful applicants for work, claimed that the defendant unlawfully discriminated against them in particular and against blacks in general in hiring new employees and assigning them to work; in promoting its workers to more desirable and higher-paying jobs; in recalling employees from layoff; and in fixing the terms and conditions of individuals' employment. For these and other alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, Et seq., and Section 1 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, they sought injunctive and other relief, including back pay.[2]
 
 
 2
 Recognizing that the defendant maintains scores of facilities in five southern states, and that the particular grievances of the named plaintiffs related only to Stevens' eight plants and three offices in Roanoke Rapids, the district court conditionally certified the action under Rule 23 as a class action, but set reasonable bounds to the litigation by designating the plaintiffs as representatives of a class which consisted of "(a)ll Negroes employed at all the Roanoke Rapids plants of J. P. Stevens & Company, Inc., on and after October 2, 1967," and "(a)ll Negroes who have applied for employment at said Roanoke Rapids plants since October 2, 1967, who claim to have been affected by the alleged racially discriminatory employment practices of the defendant."[3] All parties and their counsel were prohibited from initiating, without leave of court, communications of any kind concerning the case with actual or potential class members who were not formal parties.
 
 
 3
 Upon motion of the plaintiffs in which the defendant concurred, the district court bifurcated the proceedings, directing that resolution of the issue of the defendant's liability was to precede the determination of all questions primarily involving possible monetary relief for the class. Evidence as to liability was taken by the court, sitting without a jury, on November 6-10, 1972, and the plaintiffs introduced well over one hundred exhibits, many of them computer-generated statistical analyses of J. P. Stevens' employment practices. Plaintiffs also presented the testimony of the persons who prepared the statistical exhibits, two expert mathematical statisticians, two employees of the North Carolina Employment Security Commission, eight of the named plaintiffs, and several other Stevens employees from Roanoke Rapids, including the defendant's personnel director, a data processing employee, and one departmental overseer. The defendant countered with six hand-tabulated statistical exhibits, the testimony of its administrative assistant to the general manager of the Roanoke Rapids operations, and the testimony of fourteen of its black employees. The court entertained briefs and arguments in the spring of 1973, but postponed decision until after the Supreme Court decided Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).
 
 
 4
 Extensive written findings of fact and conclusions of law were filed on December 22, 1975.[4] The court concluded that the claims of all the named plaintiffs should be dismissed since one of them had voluntarily withdrawn from the litigation and the other twelve had "failed to prove their individual claims of employment discrimination."[5] However, based upon precedent in this Circuit which it viewed as "an apparent anomaly in practice and procedure in employment discrimination class actions," the court ruled that the dismissal of the claims of the individual plaintiffs would not affect the action as to the unnamed class members. The allegation of classwide discrimination was thus considered on its merits, and Stevens was found to have engaged in unlawful employment practices against the class in violation of Title VII and Section 1981. Specifically, the court was of the opinion that a Prima facie case had been established against the defendant, not by proof of any "specific, overt racially discriminatory employment practices," but by "statistical evidence and evidence of seemingly neutral practices."[6] The court held that Stevens had not met the burden of rebutting this Prima facie showing.[7]
 
 
 5
 Having concluded that Stevens had violated the law and that the plaintiff class was entitled to relief, the court held that such relief should encompass (1) an injunction against all racially discriminatory employment acts, omissions, and practices which the evidence had established; (2) back pay to members of the class from a date three years prior to the filing of the action on conditions later to be prescribed; and (3) an award of reasonable attorney's fees and costs. Following court-directed conferences which involved counsel for the parties as well as the Textile Workers Union of America (which represents some of the defendant's employees and was permitted to intervene solely to help fashion and effectuate a decree), the parties submitted their proposed decrees, after which the court heard objections to them and additional evidence was received.
 
 
 6
 On June 25, 1976, the district court entered a 31-page remedial decree which imposed a broad and detailed regimen of continuing affirmative obligations upon the defendant.[8] As a prefatory matter, the decree enjoined future acts of racial discrimination at the Roanoke Rapids facilities, but provided that Stevens would not be required to place any person in a job for which he is objectively unfit and cannot be made fit with reasonable training. The decree then prescribed strict racial ratios for future hiring, job placement, and promotions, and directed the defendant to eliminate racial disparities in earnings. Specific wage criteria for job assignments were defined, and it was ordered that departmental seniority for blacks be replaced by a constructive plant seniority plan. Stevens was also ordered to post job vacancies, establish job descriptions, and develop remedial training and recruiting programs. Additionally, job bidding procedures, red-circling of wages, and "bumping" standards were imposed. Certain expenses were awarded the plaintiffs, and procedural machinery was created to enforce the decree, including reporting and inspection provisions.
 
 
 7
 Turning finally to the matter of the back pay relief for which it had found as a matter of law the defendant would be liable, the court postponed any specific decision on the amount of such relief or its distribution, choosing instead to first ascertain the names of all potential claimants and to require of each of them, under penalty of waiving their possible entitlement, an affirmative demonstration of a desire to seek relief. To this end the judge ordered, on September 10, 1976,[9] that a list of all class members be assembled from "all records and compilations available" and submitted to the court, and that the clerk mail to each such person a notice and a "Back Pay Questionnaire and Claim" form, copies of both the notice and the form to be made available at Stevens' facilities.[10] The court affirmed its earlier ruling that North Carolina's three-year statute of limitations governed the defendant's back pay liability, and that back pay would thus not be allowed to anyone for the period preceding October 2, 1967, which was three years prior to the filing of the class action complaint.[11] The ban on counsel-initiated communication with class members remained in force, except that by the terms of the earlier decree communication would be allowed for the limited purpose of determining whether the terms of the injunction were being carried out.
 
 
 8
 These consolidated appeals bring into question almost every ruling of any consequence by the court below. In No. 76-2150, eight of the named plaintiffs appeal from the district court's dismissal of their individual claims against Stevens.[12] No. 76-1988 is an appeal by the defendant in which it contends that the court erred not only in permitting the action to proceed as to the class after the representative plaintiffs were dismissed, but also in finding that Stevens had engaged in unlawful employment practices. Additionally, Stevens challenges as an abuse of discretion the provisions of the trial court's decree.[13] The third appeal, No. 76-2303, is taken by the plaintiffs who contest the court-ordered back pay claim-filing requirement, the denial of their motion to amend the back pay order, and the limitation of the defendant's liability for back pay to the period of three years prior to the filing of this action.[14]EFFECT OF DISMISSAL OF INDIVIDUAL CLAIMS ON THE CLASS ACTION
 
 
 9
 Urging that the dismissal of the personal claims of the named representatives of the class precluded consideration of the class complaint, Stevens asks that we vacate the district court's finding of class-wide discrimination without inquiring into the merits of that determination. Contrary to the defendant's vigorous arguments, however, a line of employment discrimination cases in this circuit holds that the failure of the personal claims of the class representative does not debar the previously certified Rule 23(b)(2) class. Barnett v. W. T. Grant Co., 518 F.2d 543, 548, n.5 (4 Cir. 1975); Moss v. Lane Co., Inc., 471 F.2d 853, 855-6 (4 Cir. 1973); Brown v. Gaston County Dyeing Machine Co., 457 F.2d 1377, 1380 (4 Cir.), Cert. denied 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972). While it is true that we have been less than explicit as to the reasons for this rule, justification for it has been ably summarized by other courts and commentators, See, e. g., Jenkins v. United Gas Corp., 400 F.2d 28 (5 Cir. 1968); Reed v. Arlington Hotel Co., Inc., 476 F.2d 721 (8 Cir.), Cert. denied, 414 U.S. 854, 94 S.Ct. 153, 38 L.Ed.2d 103 (1973); Comment, Continuation and Representation of Class Actions Following Dismissal of the Class Representative, 1974 Duke L.J. 573; and the Supreme Court seems to have left no doubt but that this is the proper approach. See East Texas Motor Freight System, Inc. v. Rodriguez, 431 U.S. 395, 406, 97 S.Ct. 1891, 52 L.Ed.2d 453, n.12 (1977); Franks v. Bowman Transportation Co., Inc., 424 U.S. 747, 752-7, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). Thus, regardless of whether or not the post-trial dismissal of the individual plaintiffs' claims was proper, the substance of the lower court's finding of class discrimination is before us on appeal.
 
 
 10
 Relative to this point, the individual plaintiffs contend that the district court erred not only in its dismissal of their personal claims but in refusing to extend to them the benefit of its finding that Stevens had discriminated against the class of persons to which they belong. They argue that they, like the other class members, are entitled to participate in any back pay proceedings. Since this argument is dependent upon the correctness of the finding that the defendant was guilty of class-wide discrimination and since we must, in any event, review the judgment that Stevens violated the rights of the class, we turn first to this underlying issue.
 
 FINDING OF CLASS DISCRIMINATION
 
 11
 We will not review in detail the evidence, most of which was statistical in nature, upon which the court below relied in reaching the conclusion that the class was entitled to relief.[15] Rather, we will address the specific challenges made by the defendant to the soundness of the district court's decision.
 
 
 12
 As a general rule, four possible lines of defense are available to a party who disputes the substance of a determination that it has committed unlawful employment discrimination. These are (1) that the evidence upon which the court relied was an unreliable indicator of discrimination; (2) that the evidence, though credible, was insufficient to demonstrate discriminatory conduct; (3) that although discrimination was proved by competent evidence, the law does not forbid the proven act or omission; and (4) that the plaintiff's case was affirmatively rebutted in a manner which exonerates the defendant. Stevens' objections to the district court's finding of unlawful class-wide discrimination fall into these categories.
 
 
 13
 As a prefatory observation, we should note that the reliability of the statistical evidence upon which the district court based its decision is not impugned by the defendant's repeated caveats on appeal concerning the potential which inheres in statistics in general for misleading the court or misstating the truth. Nor have we been convincingly apprised of any reason for believing that the figures upon which the district judge relied inaccurately reflected conditions as they existed in Stevens' operations in Roanoke Rapids.[16] From our reading of the record, the court had good reason to be satisfied with the foundations laid for the admission into evidence of the plaintiffs' statistical exhibits and to accept the unrebutted testimony of the only expert statisticians, both called by the plaintiffs, who testified as to the significance of this evidence. It is now well-established that statistical evidence is admissible to prove employment discrimination.
 
 
 14
 Despite the district court's factual determination that Negroes, as a class, occupied an inferior position with respect to the prospects of being hired and the chances of succeeding to desirable jobs and wages, the defendant argues that proof of these facts is nevertheless insufficient to support a finding that Stevens illegally discriminated on a class-wide basis as to race. Focusing upon the "because of" language of 42 U.S.C. § 2000e-2(a)[17] Stevens suggests that it was incumbent upon the plaintiffs to demonstrate not only that they as a class were disfavored, but also that this was a result of practices which were racially discriminatory. It is urged that the statistics used to establish that the class was less favorably situated than whites are by their very nature inconclusive on this issue of causation.
 
 
 15
 This argument of the defendant elides the appropriate allocation of the burden of proof in a case such as this. With one exception addressed below, the plaintiffs, who from the beginning approached this as a case of " disparate impact" as opposed to one of "disparate treatment,"[18] were not required to prove that any particular employment decision or any specific employment practice on the part of Stevens was racially motivated. Instead, they were entitled to rest their Prima facie case, under § 703(a)(2) of Title VII, 42 U.S.C. § 2000e-2(a)(2), upon a showing that the effect of facially neutral employment practices was to discriminate against them as a group. Dothard v. Rawlinson, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). We need not inquire whether this burden was satisfied solely by the statistical evidence of the significant disadvantages under which the plaintiff class laboured, since where, as here, such proof is coupled with evidence that the defendant based hiring and other employment decisions upon the subjective opinions of white supervisors, the trial court is entitled to infer, as it did here, that the defendant illegally discriminated, Cf. Brown v. Gaston County Dyeing Machine Co., 457 F.2d 1377 (4 Cir. 1972); Barnett v. W. T. Grant Co., 518 F.2d 534 (4 Cir. 1975), in which case the burden shifts to the defendant to prove that "he based his employment decision on a legitimate consideration, and not an illegitimate one such as race." Furnco Construction Corp. v. Water, --- U.S. ----, ----, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978).[19]
 
 
 16
 The one exception we discern to the application of the Prima facie " disparate impact" principle in this case concerns the plaintiffs' complaint that their rights were violated by Stevens' use of a system of departmental seniority to determine the layoff and recall (but not promotion) rights of its employees.[20] Since an employee who transferred to another department was required to forfeit the seniority accumulated in his previous department, leaving him open to the possibility of layoff in his new job, we agree with the court below that black employees who were originally assigned in a discriminatory fashion to undesirable jobs were understandably reluctant to transfer, and were in effect "locked into" the less remunerative positions. But it was error to hold that the operation of this departmental seniority scheme violated either Title VII or § 1981. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 343-357, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), decided after the decision below, found in § 703(h) of Title VII,42 U.S.C. § 2000e-2(h),[21] a narrow exception to the broad coverage of that title, and held that a seniority system which applies evenly to all races, and which was negotiated and maintained free from any discriminatory purpose, does not itself violate Title VII, even though it perpetuates the effects of past discriminatory practices. Because the plaintiffs here concede that they do not challenge the bona fides of Stevens' seniority system, the conclusion that the departmental seniority system violated Title VII must be reversed. For the same reason, the conclusion that it violated § 1981 must also be set aside. Johnson v. Ryder Truck Lines, Inc., 575 F.2d 471 (4 Cir. 1978).
 
 
 17
 Finally, we find no merit in Stevens' other defenses, which were rejected by the district court. We specifically note that, on the issue of discrimination, Teamsters, supra, 431 U.S. at 341-2, 97 S.Ct. 1843, reaffirms the irrelevancy of the argument that the steady increase in the percentage of blacks in Stevens' total labor force during the period in controversy is a defense against the claims of earlier victims of post-Act discrimination. Accordingly, with the exception of the seniority system, the district court's conclusion that Stevens was guilty of discrimination against the plaintiff class is affirmed.
 
 DISMISSAL OF INDIVIDUAL CLAIMS
 
 18
 We turn now to the appeal of eight of the named plaintiffs Herman Jones, Luke Phipps, Clara Purnell, Patricia Purnell, Marie Robinson, Mable Moody Miles, Thomas Hawkins, and Lucy Sledge who, relying in part upon the finding of classwide discrimination which we have discussed, take issue with the dismissal of their personal claims.[22] Although we review the dismissals on an individual basis certain considerations common to them guide us in doing so.
 
 
 19
 First, the dismissals are placed in proper context by acknowledging that their sole consequence is to bar these appellants from receiving back pay with respect to the grounds upon which their claims were dismissed.[23] The judgment of dismissal did not strip any of them of class membership, and to the extent that they would personally benefit, directly or indirectly, from any of the other remedies ordered by the district court they have not been denied such benefits. Those of the named plaintiffs who are presently employed by the defendant, for example, are not by reason of the dismissal deprived of the constructive seniority which they and other black employees will receive.[24]
 
 
 20
 Second, in reviewing the reasons given by the court for barring these particular claims for back pay we are mindful that the timing of the dismissals alters somewhat the criteria by which we would usually determine on appeal whether a claimant has established a sufficient case for personal relief. Ordinarily, once it is shown at the first, or "liability" stage of a bifurcated class action, as it was here, that an employer has engaged in a pattern of illegal discrimination against Negroes by disproportionately denying them employment and assigning those who are hired to lower-paying jobs than whites, it is then presumed that individual hiring or job assignment decisions were infected by the discrimination and that victims of those decisions are entitled to make-whole awards. All an individual plaintiff must then establish at the second or "back pay" stage of trial is (a) his identity as one of the presumed discriminatees that he is black and that during the period in controversy he applied for employment and was not hired, or upon being hired was assigned to one of the low-paying jobs, and (b) any information requested of him to assist the court in determining the amount of the economic loss he suffered as a result. The burden then shifts to the employer to demonstrate by a preponderance of the evidence, if it can, that factors other than the condemned discrimination caused the decision of which the particular back pay claimant complains, e. g., that with respect to the unsuccessful applicant there were no job openings or at least none for which he was qualified, or that with respect to the employee assigned to undesirable work no better jobs were vacant or at least none for which he was qualified. If this burden is met compensation may be denied unless the claimant can show that the exculpatory reason advanced by the employer is mere pretense that, for example, white persons with qualifications identical to those of the claimant or who also did not meet the prescribed qualifications were nonetheless assigned to the position sought. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 357-362, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); Franks v. Bowman Transportation Co., 424 U.S. 747, 770-773, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); Albemarle Paper Co. v. Moody, 422 U.S. 405, 413-422, 425, 95 S.Ct. 2720, 53 L.Ed.2d 786 (1975); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); United Transp. U. Loc. No. 974 v. Norfolk & Western Ry. Co., 532 F.2d 336, 341 (4 Cir. 1975), Cert. denied 425 U.S. 934, 96 S.Ct. 1664, 48 L.Ed.2d 175 (1976).
 
 
 21
 This process for proving an entitlement to monetary restitution was cut short in this case because the decision to bar the claims of the named plaintiffs was reached after trial on the issue of the legality of Stevens' conduct, but prior to the second stage of the bifurcated proceedings which had been expressly reserved for the evaluation of requests for individual relief. While this timing was not error Per se,[25] it does restrict the circumstances under which a dismissal would have been justified. Certainly if the illegality of a particular employment practice was not established in the first stage of the inquiry then, because back pay is available only to victims of conduct found to be illegal, the trial court could properly have dismissed, prior to the proceedings for individual relief, any requests for compensation based upon the unimpeached practice. But it would have been unfair to penalize any claimant whether a named plaintiff or not for failing to affirmatively prove in the first step of the inquiry that which he was led to believe he would be expected to prove only in the later, yet-to-be-held back pay proceeding. Thus, once the illegality of certain employment practices was established, a dismissal mid-way through the bifurcated process would have been appropriate only if it was conclusively demonstrated by evidence already adduced at the "liability" stage that either a particular claimant would be Unable to subsequently substantiate his membership in the class of victims of that conduct, or that Regardless of the showing a particular claimant might make, Stevens had an acceptable and unassailable reason for its action toward him.
 
 
 22
 Finally, we know of no good reason why this procedure for litigating entitlement to back pay, with its presumptions and shifting burdens of proof, should have been altered by the fact that each of the appellant-plaintiffs appeared as a witness during the trial's initial phase. The district judge, however, apparently felt that by reason of their election to testify these class members subjected themselves to a more rigorous burden of proof. Although not the sole basis for the dismissals, the court expressed with respect to one of the appellants a view which surfaces in its stated reasons for denying all the claims:
 
 
 23
 The court is of the opinion that when an employee joins in an action of this kind following charges of the serious nature made by this plaintiff and then comes to court and testifies, he should give some testimony, either personally or through others, tending to substantiate the charges * * *.
 
 
 24
 Jt.App. 282. The record shows that the named plaintiffs testified incident to the admission into evidence of their respective employment records, and that the brief testimony given by each of them was directed to only the most rudimentary aspects of the personal grievances for which they apparently intended to seek compensation in the anticipated back pay inquiry.[26] Beyond its possible value for illustrative purposes, it appears that this testimony added little to the statistical evidence of the discriminatory impact of Stevens' employment practices and that it could properly have been disallowed by the trial court as being both cumulative on the question of discrimination and premature with respect to the back pay determinations. But there is nothing inherent in the choice of the parties to testify that would justify imposing upon them burdens in addition to those we have already mentioned and, except to the extent that admissions made during the testimony of a particular claimant could conceivably demonstrate that he should receive no award or his inability to subsequently substantiate his membership in the class of presumed discriminatees, the dismissals can draw no support from the decisions of these appellants to appear as witnesses. See Presseisen v. Swarthmore College, 442 F.Supp. 593, 600-601 (E.D.Pa.1977). With these considerations in mind, we examine the propriety of each of the dismissals.
 
 Herman Jones
 
 25
 As the district court recognized, the evidence indicated that Herman Jones, a black man, was hired as a janitor in 1962, worked as a "sweeper and cleaner" for part of 1966, and was transferred to the position of " warehouseman" in July, 1966. He held the latter job until he voluntarily left Stevens' employ in August, 1970. It was apparently his intention to seek a back pay award on the basis that, absent discrimination, he would have held a better-paying job than that of "warehouseman" during that part of his tenure with Stevens that falls within the limitations period applicable to this action.
 
 
 26
 Despite the court's conclusion that Stevens illegally discriminated in its job assignment, promotion and transfer policies, as well as in its reservation of the low-paying job of "warehouseman" for blacks, Jones was forbidden from pursuing a back pay recovery on the ground that there was no evidence from which it could be found that he "was qualified for any job higher than that of warehouseman at the time of his departure." As our prefatory comments indicate, this was error. Aside from the fact that questions of a claimant's qualifications are properly left to the "back pay" stage of trial, Jones, who had already established his assignment to the job of "warehouseman," was entitled to the presumption that he had been discriminatorily denied a better position. On remand Jones' candidacy for back pay must be restored. It will be the defendant's burden to prove, if it can, both the existence of qualifications for better-paying jobs and Jones' failure to meet them. See United Trans. U. Loc. No. 974 v. Norfolk & Western Ry. Co., 532 F.2d 336 (4 Cir. 1975), Cert. denied 425 U.S. 934, 96 S.Ct. 1664, 48 L.Ed.2d 175 (1976).
 
 Luke Phipps
 
 27
 For the same reason, the dismissal of the action as it relates to Luke Phipps, for failure to prove "by a preponderance of the evidence that (he) was the victim of racial discrimination," must be reversed. He too sought compensation for discriminatory assignment to the low-paying job of " warehouseman"; his employment history, admitted into evidence on the issue of liability, showed, as he would be expected to demonstrate at the second step of the bifurcated trial, that he was assigned to and remained in that position from the time he was first employed in April, 1969, until his termination on June 26, 1971. Like Jones, Phipps was entitled to carry with him into the back pay proceeding the yet unrebutted presumption that he was the victim of discriminatory job assignment and promotion practices; and to the extent that a reference in the findings of fact to his failure to file a charge with the EEOC can be read as another reason for barring him from seeking back pay, that ground is equally without merit, especially in light of the plaintiffs' alternative reliance upon 42 U.S.C. § 1981, which carries no exhaustion requirement. See Albemarle Paper Co. v. Moody, 422 U.S. 405, 414, 95 S.Ct. 2362, 45 L.Ed.2d 280 n.8 (1975); Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 256 (5 Cir. 1974); Robinson v. Lorillard Corp., 444 F.2d 791, 801-2 (4 Cir. 1971), Cert. dismissed 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971) and 404 U.S. 1007, 92 S.Ct. 651, 30 L.Ed.2d 655 (1972).
 
 Clara Purnell
 
 28
 The brief testimony of Clara Purnell, a black woman, reveals that she claims to have been refused employment on account of her race. The district court noted without comment that in her charge filed with the EEOC, which was admitted solely to establish Title VII jurisdiction, Purnell claimed to have unsuccessfully applied for a job with Stevens more than once between 1960 and 1969, and that a July 26, 1972, employment application, identified as hers, had been admitted into evidence on the issue of liability. In spite of its finding that Stevens engaged in class-wide hiring discrimination, the court described itself as "unable to find (her) allegations of discrimination to be substantiated" and blocked her participation in the proceedings for monetary relief. We reverse since, until the contrary is shown, the refusal to hire any black applicant within the period in controversy must be assumed to be a manifestation of the larger pattern of hiring discrimination of which Stevens was found guilty. On remand Purnell will be allowed to establish her identity as one of the class of discriminatees, if she can, by giving proof of her unsuccessful applications, and it will be up to Stevens to substantiate reasons in mitigation of liability for each rejection that is shown.
 
 Patricia Purnell
 
 29
 The complaint alleged that Patricia Purnell was denied employment because of her race. Two employment applications, bearing her name and dated October 23, 1969, and June 13, 1972, were admitted into evidence below, as was proof that she was never hired; undoubtedly she will meet the initial burden of proof in the proceedings for personal relief. Resting as it does upon the incorrect notion that Purnell was required to establish and failed to prove in the initial phase of this action the discriminatory acts of which she personally complains, the judgment of dismissal as it relates to her is vacated and remanded.[27]
 
 Marie Robinson
 
 30
 A Stevens employee, Marie Robinson complained that she had been discriminatorily denied promotion. Citing the absence of any evidence that Robinson "was qualified for some position other than the one she has been filling, that a vacancy existed and that some white person got the job," the district court refused to recognize her eligibility for back pay. But while evidence of vacancies, qualifications, and the employer's selection of a person of another race may be vital elements of the Prima facie case which a non-class plaintiff must prove in a private action under Title VII, See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the components of a Prima facie case in a class action prosecuted under the "disparate impact" approach are different. As we have already concluded, the class plaintiffs have successfully established a Prima facie case of classwide discrimination in promotions with evidence of the defendant's reliance upon the subjective opinions of white supervisors in making promotions, proof of the defendant's failure to either promulgate objective job criteria or to post notices of vacancies, and statistical evidence of the manner in which this system worked to the disadvantage of black employees. The district court failed to find that Stevens had overcome that showing. Marie Robinson will thus be entitled on remand to attempt to bring herself within the class of persons presumedly disadvantaged by Stevens' promotion policies, and if she succeeds it will be her Employer's responsibility to prove the absence of vacancies in better jobs, her lack of qualification, or some other valid reason for its failure to promote her. See Hairston v. McLean Trucking Co., 520 F.2d 226 (4 Cir. 1975); White v. Carolina Paperboard Corp., 564 F.2d 1073 (4 Cir. 1977).
 
 Mable Moody Miles
 
 31
 Mable Moody Miles, hired by Stevens in 1967, alleged that she was initially assigned to a lower-paying or less desirable job than her white counterparts and that she was denied promotions because of her race, but her allegations were found to have been unsubstantiated at the trial on the issue of liability.[28] Miles testified that she had received several promotions from her original job as "winder tender," and that her job at the time of trial, that of "warper tender," was one of the highest paid in the department in which she worked.
 
 
 32
 Like the previous claimants Miles must be afforded an opportunity to pursue back pay. Although the record suggests that the defendant may be possessed of a valid defense to her claim, the mere number of promotions she received does not exclude the possibility that, absent the class-wide discrimination in promotions which Stevens practiced, she would have received promotions leading to a better job in her own department or in a department with a better wage scale during the period in controversy. Nor can it obscure the fact that the finding of class-wide discrimination in job assignments suggests that her initial assignment, which continued into the period of limitations, may have been to a less lucrative job than she would have received had she been white.
 
 Thomas Hawkins
 
 33
 Thomas Hawkins' application for employment with Stevens was introduced into evidence, as was a copy of the charge he filed with the EEOC in which he alleged that Stevens "refused to hire (him) while at the same time they hired whites." The application is dated July 21, 1969, and on the EEOC charge both Hawkins' signature and that of a witness bear the date of July 26, 1969. Troubled by the fact that Hawkins listed on his application one of the plaintiffs' present attorneys as a character reference, by the short five-day interval between his application for work and the dates on the EEOC charge, and by its own impression that the man who witnessed the charge was "active on his own behalf and in assisting others in preparing charges of racial discrimination * * * against eastern North Carolina industries and in conducting employment litigation against them," the district court dismissed the action as to Hawkins, concluding that instead of seriously seeking employment he had applied for work only to enable him to join in this suit. As an alternative ground for its action, the court cited the absence of any evidence that Stevens' failure to hire Hawkins was "racially motivated."
 
 
 34
 We have already rejected the view that the plaintiffs, either as a class or as individual claimants, were required to prove that hiring decisions were tainted by racial animus. As to the other point upon which the dismissal was based, in Lea v. Cone Mills Corp., 438 F.2d 86 (4 Cir. 1971) (per curiam), we approved of the disallowance of back pay to unhired plaintiffs whose primary purpose in applying for work with a defendant was to test the legality of the employer's hiring practices rather than to seek actual employment. Such "test" plaintiffs are not, of course, harmed by a refusal to hire since they are not seriously interested in the job for which they apply. Hawkins maintains, however, that the conclusion that he was not a Bona fide applicant is speculative because the record does not support it and because, in any event, he was neither advised at trial that his Bona fides were in issue nor given an opportunity to disprove by direct testimony the inference drawn by the court. He asks for a chance to respond to the matter in an evidentiary hearing upon remand.
 
 
 35
 The record supports this argument that the issue of Hawkins' sincerity was never joined at trial. Neither the pleadings nor anything which transpired during the course of the proceedings can reasonably be interpreted as notice that the defendant would raise the Lea defense or that the court would Sua sponte enter that area. Hawkins was asked no questions by the trial judge or opposing counsel during his brief appearance as a witness, and the first reference of any kind to this defense was when the court issued the findings summarized above. Although we agree that the factors which troubled the district judge do suggest the possibility that Hawkins was a "tester," the consequences of attributing such status to a back pay claimant require that, as in the Lea case, his motives be considered only upon an adversarial presentation of the evidence. Accordingly, we reverse his dismissal and remand the claim for further proceedings in the district court.Lucy Sledge
 
 
 36
 The complaint states that Lucy Sledge was employed by the defendant until July, 1968, at which time she was laid off. It charges not only that she was originally and discriminatorily assigned to a lower-paying job, but also that Stevens has refused to recall or rehire her since the layoff because of her race. Canvassing a copy of her employment history and her EEOC charge, as well as her testimony at trial, the district court found no indication of either the dates of five reapplications for work she claimed to have made prior to 1970 while on furlough or of any corresponding vacancies in jobs with the defendant. Sledge was dismissed from the relief aspect of the proceedings because "defendant was hiring blacks in substantial numbers during the period in question, and the court cannot assume that this plaintiff was singled out for rejection simply because she was black."
 
 
 37
 Sledge would have us reinstate her individual claim on the ground that she is presumptively the victim of proven discrimination with respect to her recall rights. Additionally, she argues that because she also claims to have applied for and been denied a job following the layoff, she, like other unsuccessful black applicants for jobs, may pursue a claim based upon hiring discrimination. Both contentions must be addressed since if Sledge is permitted to seek back pay the size of the award for which Stevens may be found liable would be governed by the precise nature of her grievance.
 
 
 38
 We agree with the trial judge that Sledge should not be allowed to press for relief on the theory that she was the victim of a discriminatory administration of recall rights. Stevens was found to have chosen which of its laid off employees to restore to active duty solely "on the basis of departmental seniority"; there was no finding that the defendant engaged in a pattern or practice of altering this order of recall on account of the race of the idled workers. Absent such a conclusion, which would have supported the inference that the unexplained failure to recall any black worker was due to that person's race, there is no reason to suspect that plaintiff Sledge was denied reinstatement on the basis of her race unless the evidence can be said to show that in spite of its apparently neutral treatment of the class of laid off black employees in general, Stevens failed to recall this Particular plaintiff from lay off status because she is black.
 
 
 39
 Sledge urges that discrimination against her in particular was sufficiently demonstrated by evidence that her layoff continued while a number of identified women, some of them white, were hired from the pool of non-employee applicants to fill various jobs with the defendant. This, she says, conflicts with the testimony of Stevens' assistant personnel director who stated that as a matter of policy the defendant gave first priority in filling new vacancies to laid off employees whose own jobs remained idle and who were not required to re-apply for employment in order to be eligible for such jobs. Pointing to the finding that there are few, if any, special qualifications for the jobs which these others, including white women, were given and her record as a good employee, Sledge contends that it must be assumed that the reason for the failure to reactivate her by assignment to one of those positions is that she is black.
 
 
 40
 The flaw in this argument is that there was no evidence to show that Sledge was so situated on the seniority roster of laid off employees as to be eligible for recall. Because an employee's recall to the position from which she was laid off would not have occurred under the Stevens system until all other furloughed workers with more departmental seniority in the relevant job category had first been reactivated, and since the trial testimony revealed that a laid off employee would assume a vacancy outside his own department only if his company seniority was greater than that of other laid off workers vying for the job, it would not be a fair inference that a plaintiff such as Sledge had been wrongfully discriminated against unless it is also shown that the employer's failure to recall her was not due instead to the fact that her recall or reemployment rights simply had not yet matured. Upon the record it is reasonable to infer that Sledge's recall was delayed by the fact that persons with more seniority had not yet returned to work in which case the failure to offer her a job under the circumstances of this case would not amount to racial discrimination. This is not to say that an individual plaintiff who asserts that he or she was the victim of a discrimination not suffered by the class in general must exclude every hypothetical reason for the defendant's action toward him, but he must show that the employer's failure to recall him did not result from what is certainly one of the "most common legitimate reasons on which an employer might rely." International Brotherhood of Teamsters v. United States, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 n.44 (1977). Cf. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).
 
 
 41
 On the other hand, we can perceive in the record as it presently exists no difference between Sledge's claim of hiring discrimination, based on her alleged reapplications for work, and the claims of discrimination in hiring advanced by the other plaintiffs. Apart from its apparent practice of automatically recalling laid off employees on the basis of seniority, Stevens admittedly accepted applications for work from such persons just as it did from total strangers. The district court's conclusion that the defendant practiced wholesale discrimination in hiring was not qualified to exclude from its scope laid off employees who resubmitted applications, and on remand Sledge should be allowed to proceed in the same fashion as Clara Purnell with respect to this aspect of her claim. Of course, she must present credible evidence of the various applications she claims to have made, and among the possible defenses available to Stevens will be proof, if it exists, that it has pursued a non-discriminatory policy which was legitimately applied to Lucy Sledge of subjecting the re-applications of laid off employees to the same seniority standards that govern recalls without application.
 
 
 42
 -----oOo-----
 
 
 43
 In holding that it was error to preclude any of these named plaintiffs from participating in the proceedings for back pay we, of course, express no opinion as to whether or not they will eventually be entitled to monetary relief. The back pay proceedings had not yet been initiated at the time this appeal was taken, and it is impossible at this juncture to ascertain whether the appellants will succeed in bringing themselves within the class of entitled discriminatees or whether the defendant has a legitimate defense to any such claims. Additionally, the district court should not consider itself restricted in any fashion in the formulation of standards for computing and distributing the back pay which may be due members of the class.
 
 THE REMEDIAL DECREE
 
 44
 The defendant contests in a general fashion the various measures prescribed by the district court for the equalization of employment opportunities between the races at Stevens' Roanoke Rapids operations. With those objections in mind we have examined the remedial decree and, with the exception of those provisions hereinafter specifically discussed, conclude that it does not constitute an abuse of the broad discretion with which the federal district courts are vested for the purpose of restoring black persons to full citizenship in the workplace.
 
 
 45
 It may be true, as Stevens maintains, that the decree in question imposes upon the employer an array of affirmative obligations which is unprecedented in its dimensions, the degree to which it limits the defendant's free hand in personnel matters, and the difficulty that may arguably be experienced in complying with its provisions. But to suggest that this alone is reason to modify the injunction is to disregard the highly individualistic nature of the relief which the courts are required to provide once the disparate racial impact of an employer's practices has been demonstrated. The court below was dutybound to "render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future," Albemarle Paper Co. v. Moody, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975), and nothing less than "the most complete relief possible" under the circumstances would fulfill that obligation. Franks v. Bowman Transportation Co., 424 U.S. 747, 764, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). Given that the defendant employed several thousand persons in hundreds of job categories in scores of departments, and that the various discriminatory practices for which it was called to task were found to have disadvantaged black employees and potential employees in a number of different ways, the complexity of the injunction is for the most part both understandable and necessary. To the extent that the intricacies of the decree may prove to provoke confusion or practical difficulties in its implementation, the proper course will be to petition the court for clarification or amendment of the decree pursuant to the procedure therein established for that purpose.
 
 
 46
 The other, and most persistent, objection raised by the appellant to certain features of the decree is that they amount to "pro-black and anti-white" "racial directives" which will result in the "demoralization" of both black and white employees and work a reversal of the aims of equal employment opportunity legislation. It suffices to say that two of the challenged provisions the "red circling" of wages and seniority relief have consistently been upheld in the face of such criticism in the past, and are now acceptable tools for the eradication of the practices condemned by Title VII. See Franks v. Bowman Transportation Co., 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); Swint v. Pullman-Standard, 539 F.2d 77, 100-101 (5 Cir. 1976). Cf. Robinson v. Lorillard Corp., 444 F.2d 791, 796, 799 (4 Cir. 1971) Cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971) and 404 U.S. 1007, 92 S.Ct. 651, 30 L.Ed.2d 655 (1972). The appellant has not persuaded us that either of these remedies is unworkable, unnecessary, or likely to produce unusually harsh results in the circumstances of this case and, accordingly, we agree with the decision of the district judge to employ them. We are of the opinion, however, that seniority relief should be granted, not to all black employees as the decree presently provides, but only to those who suffered illegal discrimination, with seniority consequences, during the appropriate period of limitations. United Air Lines, Inc. v. Evans, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).
 
 
 47
 Stevens' objections to the imposition of hiring and promotional quotas, however, present a more serious question for our consideration.
 
 Hiring Quotas
 
 48
 The decree requires that the defendant hire new employees in accordance with numerical formulae. We refer to these formulae as "quotas" for want of a better term to describe the specific percentages of total job placements which Stevens was ordered to fill with black and with white persons, respectively.[29]
 
 
 49
 A blanket hiring quota is contained in Paragraph 5 of the decree under the subtitle of "Hiring Provisions":
 
 
 50
 5. For all applications for jobs other than those clerical jobs specified in paragraph 10, beginning with the calendar quarter next beginning after entry of this Decree, in each calendar quarter, the defendant shall make bona fide offers of employment to the same ratio of black male applicants as of white male applicants, and it shall make bona fide offers of employment to the same ratio of black female applicants as of white female applicants. If, for example, the defendant makes such offers to sixty per cent of the white male applicants and forty-five per cent of the white female applicants in a calendar quarter, it shall make such offers to not less than sixty per cent of the black male applicants and not less than forty-five per cent of the black female applicants in that calendar quarter.[30]
 
 
 51
 Clerical vacancies are excepted from the operation of Paragraph 5 and are addressed separately in Paragraphs 10 and 11:
 
 
 52
 10. Vacancies in the following jobs shall be filled, subject to availability, on an alternating basis, with at least one black placed for each white so placed in the plant or office in question, until forty percent of the employees in those jobs in that particular plant or office are black. This percentage figure is taken from plaintiffs' Exhibit 63, which shows that blacks constituted 41.9% Of the clerically-qualified applicants for employment referrals at the Roanoke Rapids office of the North Carolina Employment Security Commission. The jobs are:
 
 
 53
 (a) Clerical jobs in the Central Office;
 
 
 54
 (b) Clerical jobs in the Customer Service Office;
 
 
 55
 (c) Clerical jobs in the Information Services Center;
 
 
 56
 (d) Clerical jobs in the defendant's other (Roanoke Rapids) facilities ......
 
 
 57
 11. All facilities which are mentioned in paragraphs 10(a) through 10(d), after meeting the requirements of paragraph 10, shall thereafter for a period of two years together make bona fide offers of employment to the same ratio of black applicants for the jobs mentioned in paragraph 10 as of white applicants for such jobs.[31]
 
 
 58
 Separate provision is also made for the selection of persons to fill weaving jobs. Paragraph 15 of the decree reads:
 
 
 59
 15. Vacancies in weaving jobs shall be filled, subject to availability, on an alternating basis in each plant, with at least one black placed for each white so placed, until forty percent of the total weaving jobs held by males are held by blacks. This percentage figure is taken from Finding 46 in the court's decision, which found that when the defendant ended its discrimination against black women in making initial assignments of women to weaving jobs, 39.4% Of the women so placed were black.[32]
 
 
 60
 Stevens raises two objections to these provisions of the decree. It contests the propriety of any quota relief whatsoever and, in any event, questions the validity of the statistical requirements upon which the quotas are based, notably the "applicant flow" approach of Paragraph 5. We reach only the first objection since we conclude that for the reasons hereinafter set forth the imposition of hiring quotas was inappropriate in this case.
 
 
 61
 The question of whether the imposition of hiring quotas is an appropriate judicial response to a finding that an employer has been guilty of racial discrimination in its employment decisions has not been squarely addressed by us, nor has the Supreme Court provided definitive guidance in this area. Our reading of the several opinions in the recent case of Regents of the University of California v. Bakke, --- U.S. ----, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), indicates that the imposition of hiring quotas in Title VII cases is still an open question, although Mr. Justice Powell noted that "(t)he courts of appeals have fashioned various types of racial preferences as remedies for constitutional or statutory violations resulting in identified, race-based injuries to individuals held entitled to the preference." Id. at ----, 98 S.Ct. at 2754.
 
 
 62
 The closest our circuit has come to facing the issue was in the case of Harper v. Kloster, 486 F.2d 1134 (4 Cir. 1973). There the plaintiffs asked us to hold that in addition to the other relief from employment discrimination granted by the district court, racial hiring quotas should have been fixed for certain categories of fire department employees. Recognizing the uncertain constitutional status of quotas, and noting the rigid scrutiny to which racial classifications are subjected, the district court, without addressing the underlying issue of the permissibility Vel non of imposing any type of quota, had rejected the same request on the ground that the plaintiffs had shown no "sufficiently compelling need" for a race-based quota. "Because effective relief can be granted without resort to this device, the Court will avoid it." Harper v. Mayor and City Council of Baltimore, 359 F.Supp. 1187, 1213-1215 (D.Md.1973). Our opinion expressed agreement with both the district judge's discussion and his conclusion, citing without further comment the portion of his opinion on the subject. 486 F.2d at 1136.
 
 
 63
 The other "quota" case in this circuit is Patterson v. American Tobacco Co., 535 F.2d 257 (4 Cir. 1976), Cert. denied, 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976), which was likewise decided without the need to authoritatively determine whether quotas may validly be imposed in employment discrimination actions. There we considered a district court order designed to remedy race and sex discrimination in the appointment of supervisory employees which required that vacancies in such positions be filled with qualified blacks and women (except when none could be found) until the percentage of blacks and women in these jobs equalled the percentage of blacks and women in the area work force.[33] Although there is dictum in Patterson to the effect that Title VII does not forbid this type of preferential relief,535 F.2d at 274, the quota provision of the decree in that case was disapproved on the basis that "the rate at which the company currently appoints blacks and women to supervisory positions is sufficient to show that there is no compelling need for the imposition of a quota." 535 F.2d at 275 (footnote omitted).[34] In the light of Harper and Patterson it can fairly be said that, assuming quotas are permissible elements of remedial decrees in employment discrimination cases, they are appropriate only under limited and " compelling" circumstances. Where, as in Harper, effective relief can otherwise be afforded, or where, as in Patterson, an employer, subsequent to the effective date of Title VII, has made convincing and satisfactory progress toward the goal of equal hiring opportunity for persons of all races, it will ordinarily be unnecessary for the court to consider the prescription of quotas. Such a course avoids the troublesome questions of possible statutory and constitutional conflict inherent in the use of quotas,[35] and the district court may, of course, retain jurisdiction to monitor the future progress of the employer.
 
 
 64
 A similarly cautious approach to the imposition of curative quotas or "goals" has been followed by even those courts which seem to have expressly endorsed the use of race-based hiring ratios. Harper, for example, is in accord with the view of other courts which have expressly endorsed or rejected the use of hiring ratios depending in part upon whether other, less color-conscious relief, was considered capable of redressing an employer's prior discrimination. See, e. g., United States v. City of Chicago, 549 F.2d 415, 437 (7 Cir. 1977), Cert. denied, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1978); Morrow v. Crisler, 491 F.2d 1053 (5 Cir. 1974), Cert. denied, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974); Vulcan Soc. of N.Y. City Fire Dept., Inc. v. Civil Service Com'n., 490 F.2d 387, 398 (2 Cir. 1973). Other cases voice Patterson's concern for the effectiveness of an employer's own efforts to correct past inequities. See, e. g., United States v. City of Chicago, supra; Rios v. Enterprise Association Steamfitters Local 638, 501 F.2d 622, 631-632 (2 Cir. 1974). And those who have considered more often than we the situations in which such preferential relief may be proper have identified a third factor whether the discrimination to be remedied has been egregious, purposive or blatant. See, e. g., Kirkland v. N.Y. St. Dept. of Correctional Services, 520 F.2d 420, 427 (2 Cir. 1975), Cert. denied, 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976); NAACP v. Allen, 493 F.2d 614 (5 Cir. 1974).
 
 
 65
 Neither these nor any other considerations which might appropriately enter into a decision to order a hiring quota were addressed by the court below.[36] Because we think that the record on appeal itself refutes any contention that the requisite "compelling circumstances" were present to justify this aspect of the decree, we find the hiring ratios to be inappropriate on the facts of this case.
 
 
 66
 Significantly, in the present case the court specifically found that Stevens had not "consciously engaged in discriminatory employment practices" or deliberately chosen to violate either Title VII or § 1981 by its hiring practices. "Except as to such facially neutral practices as its seniority rules, word-of-mouth hiring, etc., there is in fact no readily apparent means the defendant could have adopted, consistent with good business practice, to avoid these consequences." Jt.App. 330, 338-339. Although this is no defense to the unfair labor practices Stevens was found to have committed, and is not dispositive of the quota question, we think that this finding, together with the absence of any evidence of overt discrimination, rebuts the appellants' argument that the discrimination was "egregious" or flagrant, and is an answer to the charge that this case involves the kind of "exaggerated facts" which Judge Widener's separate opinion in Patterson, 535 F.2d at 276, suggests would raise the issue of the need for a quota. At this juncture there is no reason to assume that the defendant will not comply with alternative injunctive directions designed to remedy the discrimination at Roanoke Rapids.
 
 
 67
 Moreover, the evidence shows that during the pendency of this litigation substantial progress was made in removing the disparities between the hiring of blacks and the hiring of whites by the defendant. The district judge found that the number of black persons hired between 1967 and 1972 had significantly increased:
 
 
 68
 93. From 1967 to 1972 the number of black employees at Stevens grew from 533 to 1,271 while the number of white employees dropped from 2,809 to 2,499. During this period the percentage of blacks in the total labor force rose from 15.9% To 33.7% While the percentage of whites dropped from 84.1% To 66.3%. This is attributable, at least in part, to the fact that more whites are now seeking employment in occupations with higher pay scales than the textile mills. But there is still a much larger number of applicants, black and white, than there are jobs to be filled.
 
 
 69
 94. In defendant's Roanoke Fabricating Plant the number of black employees increased from 28.9% To 50.2% Of the total between 1967 and 1972.
 
 
 70
 Evidence taken in the interim between trial and the entry of the decree also indicates that during the years 1972-1975 50% Of the 5,000 new hires were black which was in excess of the proportion of blacks in the local labor force. The plaintiffs themselves concede that at the end of 1975 blacks constituted at least 37.1% Of Stevens' employees compared to only 19.4% In 1970. The marked improvement in black employment is readily apparent in light of the fact that in 1974, blacks made up only 40.6% Of the area's entire civilian labor force. As we have heretofore noted, these figures do not exonerate the defendant from liability for discrimination. Nonetheless, this evidence was significant to demonstrate that the defendant, prior to the entry of the decree, was not intractable on the issue of increasing the number of minority persons hired, and had made commendable progress in removing the inequities of the past.
 
 
 71
 In the light of these observations, we believe that whether or not quotas are permissible remedies, effective relief from hiring discrimination can be granted in this case without resort to them. Those specific aspects of the hiring process which were found to have accounted for the disproportionate rejection of black applicants the policy of relying upon the subjective conclusions of white officials, the failure to establish objective hiring guidelines, and the failure to post vacancies are directly and sufficiently addressed by other provisions of the decree.
 
 
 72
 The decree directs the defendant to promulgate and employ objective, racially fair, job-related standards for the purpose of determining whether or not an applicant is fit to work. These are to be filed with the court and are subject to the objections of the plaintiffs and the Union; a Special Master is directed to hear and resolve such objections. Notices of all vacancies to be filled with new employees are also to be posted at every place at which employment applications are taken, and are to include the training rate of pay, the usual length of training, and the full rate of pay for each job, as well as a sufficiently detailed description of the nature of the position to be filled. See Paragraph 23. These descriptions are also to be filed with the court and may be scrutinized by the plaintiffs and the Union. In response to the fact that some applicants for clerical jobs had apparently in the past mistakenly completed an application for production plant employment and therefore had not been considered for clerical jobs, Stevens is required to use a separate application form for clerical positions and to apprise all job applicants of this fact via posted notice.
 
 
 73
 Additionally, the decree requires the defendant to invite previous black applicants who indicated an interest in clerical work or who possess clerical skills to reapply for future clerical openings. Stevens must also designate an "Equal Employment Opportunity Officer," who is to investigate and attempt to resolve any black applicant's complaint of discrimination. Records of all such complaints and the efforts made to resolve them are to be maintained, and job applicants are to be informed by posted notice of this officer's name, location and function, as well as of the names and addresses of plaintiffs' counsel who they may contact if they are dissatisfied with this grievance process or its results. Proceedings to enforce the decree may be instituted before the Special Master by plaintiffs' counsel, by an aggrieved applicant through his or her own counsel, or by the Union on behalf of the aggrieved person, and Paragraph 38 further provides that the Special Master may act Sua sponte. Counsel for the parties are to prepare an outline of these and the other remedial provisions of the decree, which is to be published in the local newspaper for three successive days.
 
 
 74
 Stevens is already required by the decree to submit quarterly reports containing information that will enable the plaintiffs, the Union, the Special Master and, most importantly, the district court to monitor compliance with the decree.[37] These reports will enable the court to periodically determine whether the decree, Sans quotas is working effectively to eliminate hiring discrimination. In the event that the remedial measures which we have summarized do not appear to be accomplishing this goal, then, exercising the jurisdiction it has retained, the court may, on a record of the particular weaknesses or deficiencies of the relief measures, consider modification of the decree and tailor it to address the problem areas. If, at some future time, the district court concludes that under the demanding standards by which their propriety is determined, quotas should be imposed, it will then be time enough to consider the ultimate question of whether or not the imposition of hiring quotas, as an abstract issue, is permissible.
 
 Promotional Quotas
 
 75
 As we have already noted, certain of the hiring provisions of the decree may also be interpreted to require that Stevens promote its employees in accordance with numerical formulae. See nn.31 and 32, Supra. Also, Paragraph 16 contains a purely promotional quota, requiring that until the number of blacks placed in various supervisory positions and the positions of "fixer" and "fixer trainee" equals "one-third of the total of such jobs in defendant's Roanoke Rapids operations," No vacancy in these positions shall be filled until affirmative efforts have been made to place a qualified black employee in such vacancy. The particular discriminatory practices which these remedies were designed to redress were, as in the case of hiring, Stevens' reliance upon the subjective conclusions of white officials in choosing persons for promotion, its failure to establish objective guidelines for promotions, and its failure to post notices of vacancies that were to be filled by promotion. Additionally, the court had found that the defendant had "reserved" its clerical, supervisory, and "fixer" jobs for whites.
 
 
 76
 In light of the district court's expressed apprehension that "the implementation of its decree may in fact cause considerable hardship if not indeed disruption of the operation of the defendant's business, with the very real possibility that many of the members of the class sought to be protected by the decree as well as many innocent employees of the defendant may be adversely affected," Jt.App. 527, we see no reason for the imposition of the promotional quotas when there was no compelling need for them.[38] Our conclusion is based not only upon the court's own finding that "(d)uring the period 1967-1972 blacks were promoted in larger percentages than whites in four of defendant's plants and in lesser percentages in two of its plants," Jt.App. 329, but also upon the fact that effective relief can be afforded without resorting to this extreme procedure. The practices condemned by the court below as having a discriminatory effect are rectified by other of the injunctive provisions,[39] and there is no reason to assume that these measures will be ineffective.
 
 
 77
 Accordingly, we vacate both the hiring and promotional quotas ordered by the district court subject, of course, to the court's power to monitor progress under the decree and to supplement the remedies at some future time if for some reason not presently apparent, they should prove to be ineffective.
 
 PERIOD OF LIMITATIONS
 
 78
 The plaintiffs challenge the trial court's decision to limit the defendant's potential back pay liability to the period beginning three years prior to the filing of the class action on October 2, 1970, contending instead that the class members should be allowed to seek back pay for the consequences of discrimination suffered by them during the period of three years prior to September 5, 1969, which is the date upon which charges of discrimination were first filed by any of the named plaintiffs with the Equal Employment Opportunity Commission. Under the court's ruling, back pay would not be allowed for the period prior to October 2, 1967, while the plaintiffs' suggestion would extend the defendant's monetary liability back to September 5, 1966.[40]
 
 
 79
 By the 1972 amendment, Title VII now expressly limits liability for back pay to a period beginning two years prior to the filing with EEOC of the charge upon which the subsequent judicial action is based,[41] but no limitation whatever was contained in the earlier version of the statute, and the amendment is inapplicable to actions, such as the present one, which were pending in the courts when the new legislation was enacted on March 24, 1972, Pub.Law No. 92-261, § 14, 18 Stat. 113. In the absence of statutory direction, in pre-1972 Title VII actions the courts have routinely held that the period of potential monetary liability for continuing discrimination is governed by the applicable state statute of limitations, but that such statute is tolled by the filing of the EEOC charges which form the basis for the litigation.[42] EEOC v. Enterprise Ass'n Steamfitters, 542 F.2d 579, 590 (2 Cir. 1976), Cert. denied, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977); EEOC v. Detroit Edison Co., 515 F.2d 301, 315-316 (6 Cir. 1975), Cert. granted, judgment vacated, and Remanded for consideration in light of Teamsters (which did not concern this matter), 431 U.S. 951, 97 S.Ct. 2669, 53 L.Ed.2d 267 (1977); United States v. Georgia Power Co.,474 F.2d 906, 925 (5 Cir. 1973). Cf. Payne v. Weirton Steel Co., 397 F.Supp. 192 (N.D.W.Va.1975). None of the published authorities cited by the court below are to the contrary and, accordingly, it was error to calculate the period of liability from the date of filing the class action instead of the date of filing the relevant administrative charges.[43]
 
 BUMPING PROVISIONS
 
 80
 Paragraph 32 of the remedial decree alters the defendant's practice of choosing employees for layoff on the basis of departmental seniority in the affected job category, providing instead that black employees may avoid layoff by exercising their plant seniority:
 
 
 81
 32. A member of either subclass (male or female) of present black employees who would otherwise be laid off shall be entitled to "bump" an employee with less plant seniority, as long as the junior employee's job can be performed by the subclass member with reasonable training by the defendant.
 
 
 82
 We disapprove of this provision of the decree.
 
 
 83
 First of all, we think it is indistinguishable in its effect from the "bumping" provision of the decree which we ordered eliminated in Patterson v. American Tobacco Co., supra. In that case the district court had directed that immediately upon entry of the decree black and female employees could bump junior employees from preferred jobs, provided only that they had the requisite seniority and were willing to learn the new job. In rejecting such a procedure we relied heavily upon Local 189, United Papermak. & Paperworkers v. United States, 416 F.2d 980 (5 Cir. 1969), in which the court observed:
 
 
 84
 White incumbent workers should not be bumped out of their Present positions by Negroes with greater plant seniority; plant seniority should be asserted only with respect to new job openings. This solution accords with the purpose and history of the legislation.
 
 
 85
 416 F.2d at 988. We noted that "bumping is an unsettling process. Its domino effect adversely affects employees who have done no wrong and who, indeed, may have been the victims of discrimination." 535 F.2d at 268. Although Paragraph 32 is not quite so drastic as the provision in Patterson since it is operative only with respect to periods of layoff, it nevertheless represents a break with past practice and penalizes employees who, guilty of no wrongdoing, have had the expectancy that the security of their jobs is dependent not upon the seniority of persons in the plant at large, but rather of those working in the same department or job category.
 
 
 86
 Second, and we think most importantly, Paragraph 32 would require the significant alteration of a seniority system which itself violates neither Title VII nor § 1981. See p. 636, Supra. While we are not prepared at this time to hold that Title VII's insulation of bona fide seniority systems from a finding of illegality renders them completely immune to judicial alteration, we are of the opinion that in this case any such alteration is unnecessary. In affirming the district court's award of seniority relief to victims of discrimination in job assignments and promotions, pp. 643, 644, Supra, we have already approved of the provision made by the court below for the retention of seniority by past discriminatees who transfer to other departments under the reformed promotion and transfer practices instituted by the decree. The grant of this seniority to victims of Stevens' unlawful practices will, to the extent necessary, insulate them from layoff in their positions, without necessitating a drastic revision of the nondiscriminatory system by which all employees have come to expect their layoff rights to be determined.
 
 CLAIM-FILING REQUIREMENTS
 
 87
 Finally, we find no reversible error in the district court's imposition of the claim-filing requirement prefatory to the proceedings for back pay relief. Rule 23(d)(2) of the Federal Rules of Civil Procedure sanctions this practice,[44] the express purpose of which in this case was the identification of all potential claimants to back pay and to establish a cutoff date beyond which claims would not be entertained. In view of the large number of persons who qualify for membership in the class, an unknown portion of whom also qualify for individual relief, we find the filing proviso to be an appropriate first step toward the eventual assessment and resolution of the compensation claims. Robinson v. Union Carbide Corp., 544 F.2d 1258 (5 Cir. 1977) (dictum), Modifying 538 F.2d 652 (5 Cir. 1976), Cert. denied, 434 U.S. 822, 98 S.Ct. 65, 54 L.Ed.2d 78 (1977); Bing v. Roadway Express, Inc.,485 F.2d 441 (5 Cir. 1973); Iowa v. Union Asphalt & Roadoils, Inc., 281 F.Supp. 391 (S.D.Iowa 1968); 7A Wright & Miller, Federal Practice and Procedure § 1793 (1972); 3B Moore's Federal Practice P 23.72 (1976). Nor are we persuaded by the plaintiffs' argument that the court's provision for notice or its wording of the claim questionnaires will result in the wholesale dismissal of claims and is violative of due process and Title VII. The trial courts have great latitude in such matters, Bing v. Roadway Express, Inc., supra, 485 F.2d at 448-449, and in the absence of persuasive evidence that the challenged procedure will frustrate valid claims, we will not require the district judge to depart from what facially appears to be an appropriate procedural course.
 
 
 88
 -----oOo-----
 
 
 89
 The judgment of the district court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.
 
 
 
 *
 Judge Craven participated in oral argument but died before the opinion was prepared
 
 
 [1]
 It was alleged in the complaint, admitted in the answer, and to some extent demonstrated at trial that all but three of the plaintiffs had earlier lodged charges against Stevens with the Equal Employment Opportunity Commission. The first of such charges were filed with EEOC on September 5, 1969. Right-to-sue letters were received by all but one of the complainants
 
 
 [2]
 The litigation was commenced prior to the amendment of Title VII by the Equal Employment Opportunity Act of 1972, 86 Stat. 103
 
 
 [3]
 A "Notice of Pendency of Class Action" was published in a Roanoke Rapids newspaper. It advised class members of the pendency and possible consequences of the action, of their right to seek exclusion from the class, and of the option they had of obtaining counsel to represent each class member personally at trial. The class designation was not challenged in the court below nor on appeal
 
 
 [4]
 Though officially unreported, they are published at 10 EPD P 10,58 5
 
 
 [5]
 In the September 27, 1976, "Certificate Directing the Entry of Judgment With Respect to the Personal Claims of the Named Plaintiffs," it was stated that the effect of these dismissals was to prohibit the named plaintiffs from either participating in the class back pay determinations or from attempting to remedy at the back pay hearings the perceived evidentiary deficiencies in their claims. But an earlier-filed December 22, 1975, "Order of Dismissal," 10 EPD P 10,585 at 6441, to which the judgment entered in accordance with the certificate refers, expresses a more limited view of the effect of the dismissal, stating that "(e)xcept with respect to the grounds upon which the respective individual claims are being dismissed, this order is without prejudice to the rights of the individual named plaintiffs to establish their membership in any class for which relief may be granted on other grounds."
 
 
 [6]
 Plaintiffs were found to have established discrimination in Stevens' employment practices by proof of: the defendant's reliance upon standardless, subjective conclusions in deciding which persons would be hired, promoted, and transferred; the disproportionately higher percentage of white than black applicants who were hired and of black than white new employees who were originally assigned to low-paying jobs; the reservation of supervisory, clerical, and other higher-paying positions for whites and of low-paying work for blacks; the disparities between the average hourly pay of white and black male employees; the use of a departmental seniority system which, if they chose to transfer to better jobs, disadvantaged blacks with regard to lay-offs, recalls, and transfers; and the imposition upon black females of longer waiting periods between date of application and date of hire than were imposed upon whites
 
 
 [7]
 Without disputing their factual accuracy, the court rejected as legal defenses to the action the defendant's arguments that it had never barred blacks from employment; that many applicants of both races were not hired; that the percentage of blacks in the Stevens work force was rising; that the defendant had never fired any person on account of race; that Stevens' testing system for applicants was not discriminatory; that blacks had received some promotions; that records of the race of employees were not kept by the employer; and that the defendant had acted in good faith. The court also held that Stevens had shown no business justification for its discriminatory practices
 
 
 [8]
 See 12 EPD P 11,047
 
 
 [9]
 See 12 EPD P 11,251
 
 
 [10]
 The notice essentially stated that the action had been filed and defined the plaintiff class. It related that although the claims of the individual plaintiffs had been denied, the court had found that members of the class had been discriminated against in violation of the law. It further advised that if the reader fell within the class, felt that Stevens failed to hire or promote him on account of his race, and wished to make a claim for back pay or monetary relief on that ground, he should file a claim before November 15, 1976, by filling in the accompanying questionnaire, signing it, and mailing it to the clerk of court, or else his claim would be forever barred
 The questionnaire asked three questions: (1) whether it was claimed that, due to race, Stevens failed to hire the person; (2) whether it was claimed that, due to race, Stevens failed to place or promote the person as desired; and (3) whether the claimant would submit to questions by the attorneys or the court.
 Both documents were to be mailed to potential class members no later than October 15, 1976.
 
 
 [11]
 See 12 EPD P 11,249
 
 
 [12]
 The appeal is prosecuted under 28 U.S.C. § 1291, because the dismissals were embodied in a judgment and certified as final, under Rule 54(b), by the court below
 
 
 [13]
 We have jurisdiction under 28 U.S.C. § 1292(a)(1) of this appeal from the grant of injunctive relief. Upon motion of the appellant-defendant, we granted a stay of the district court's decree pending this appeal and until further order of this court. See 12 EPD P 11,252
 
 
 [14]
 Since they relate to back pay proceedings that have not yet begun, both of these rulings are interlocutory. But the district judge, after making the requisite findings, issued a certificate of appealability under 28 U.S.C. § 1292(b), and this court gave the plaintiffs permission to appeal. Because this appeal has been allowed, the notices and questionnaires have not yet been mailed to class members
 
 
 [15]
 The evidentiary bases for the court's conclusion are set forth in detail in the findings of fact, 10 EPD P 10,585
 
 
 [16]
 We specifically note the propriety of the court's reliance upon applicant-flow ratios for the purpose of evaluating the historical operation of the hiring process, See Hazelwood School District v. United States, 433 U.S. 299, 308, 97 S.Ct. 2736, 53 L.Ed.2d 768 n.13 (1977), as well as the deference we owe the court's choice of the species of data most appropriate to its inquiry. Id. at 312, 97 S.Ct. 2736
 
 
 [17]
 42 U.S.C. § 2000e-2(a) provides:
 (a) It shall be an unlawful employment practice for an employer
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, Because of such individual's race, color, religion, sex, or national origin; or
 (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, Because of such individual's race, color, religion, sex, or national origin.
 (Emphasis added).
 
 
 [18]
 The two approaches are defined and contrasted in International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335, 97 S.Ct. 1843, 52 L.Ed.2d 396 n.15 (1977)
 
 
 [19]
 Furnco was a disparate treatment case controlled by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). However, the shifting of the burden to the employer upon the establishment of a Prima facie case by the plaintiffs applies equally in a case of disparate impact. This was recognized by Mr. Justice Marshall in his separate opinion in Furnco when he stated:
 "Once the plaintiff has established the disparate impact of the practice, the burden shifts to the employer to show that the practice has 'a manifest relationship to the employment in question.' * * * There is nothing in today's opinion that is inconsistent with this approach or with our prior decisions." --- U.S. at ----, 98 S.Ct. at 2953.
 
 
 [20]
 Under the system, those with the least departmental seniority in a job category, regardless of ability, were laid off first and recalled last
 
 
 [21]
 42 U.S.C. § 2000e-2(h) provides in part:
 Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply * * * different terms, conditions, or privileges of employment pursuant to a bona fide seniority * * * system, * * * provided that such differences are not the result of an intention to discriminate because of race * * *.
 
 
 [22]
 The other named plaintiffs have not appealed
 
 
 [23]
 See n.5, Supra
 
 
 [24]
 See pp. 643 - 644, Infra
 
 
 [25]
 The relegation of requests for individual relief to a discrete stage of the trial is a management device, the purpose of which is to make the litigation of class actions less cumbersome. See Manual for Complex Litigation, § 4.12, and the Notes of the Advisory Committee on Rules to the 1966 Amendments to Fed.R.Civ.P. 23. Even where, as here, there is no doubt but that some class members will be permitted to assert entitlements to monetary awards, it would be inconsistent with the goal of streamlining the proceedings to require the court to close its eyes at an earlier stage of the trial to proof that a particular class member will not succeed in any subsequent quest for back pay. As we have pointed out, the essential error of the district court in the cases of the individual claimants was the dismissal of their claims without taking into account the presumption in their favor resulting from its ruling that class discrimination existed
 
 
 [26]
 Typical was Herman Jones who, in addition to verifying the accuracy of the defendant's written record of his employment history and the authenticity of exhibits relating to his dealings with the EEOC, briefly testified as to his race, date of hire, and initial assignment to the job of Janitor. Tr. 139-141
 
 
 [27]
 The complaint also relates that both Purnells originally maintained that they were denied jobs because of their civil rights activities. But no evidence bearing on the issue of vindictiveness was offered at the liability stage of trial, and it is conceded on appeal that these allegations have been abandoned. This admission will, of course, bind these plaintiffs on remand
 
 
 [28]
 Another of her grievances that, because of race, she was not assigned to the first shift was also found to lack support. But the dismissal of this charge is expressly not questioned on appeal
 
 
 [29]
 "Quotas are mandatory percentages of minority employment representation." 30 Congressional Quarterly 3092 (Dec. 2, 1972). Whether the provisions of the decree might be more accurately termed "goals," "targets," "minority preferences," etc., has little bearing on the issues in this case. As Mr. Justice Powell observed:
 "This semantic distinction is beside the point: the special admissions program is undeniably a classification based on race and ethnic background. * * * Whether this limitation is described as a quota or a goal, it is a line drawn on the basis of race and ethnic status." Regents of the University of California v. Bakke, --- U.S. ----, ----, 98 S.Ct. 2733, 2748, 57 L.Ed.2d 750 (1978).
 
 
 [30]
 Strictly construed, this paragraph requires only that Stevens "make bona fide offers of employment" to the appropriate percentage of black applicants, as opposed to the requirement that Stevens actually employ them. As a practical matter, however, this is a hiring quota since, because the offer of employment must be bona fide, the defendant must hire the offeree unless the applicant rejects the offer. And although in another part of the decree the court disclaimed any intention to require Stevens to hire a person who is found by objective standards to be "unfit to work", this proviso apparently would not excuse a failure to hire in accordance with the "applicant flow ratio" of Paragraph 5. Aside from the fact that an offer to an "unfit" person would likely not be considered bona fide, one of the court's findings of fact was that "most of the job categories in these plants can be filled by any willing, able-bodied person." Moreover, the defendant was ordered to "provide such reasonable training to as many blacks as may be necessary to insure compliance" with this part of the decree
 
 
 [31]
 Neither Paragraph 10 nor Paragraph 11 requires that clerical vacancies be filled with "new hires," although in the light of evidence adduced at trial and the court's acknowledgment that clerical employees need prior training to do the work, it is most likely that this will be the case with regard to a substantial portion of such openings. To the extent that the defendant is apparently free to promote to these jobs persons who are already in its employ, the quota is a "promotional quota" rather than a "hiring quota," and is addressed in the next subsection of this opinion
 
 
 [32]
 The court found that "(p)revious experience is not required in order to be assigned to this job, and the defendant frequently hired inexperienced persons off the street for weaving jobs." But as in the case of clerical vacancies, Paragraph 15 does not exclude the possibility that weaving vacancies will also be filled by promotions. Cf. n.31, Supra
 
 
 [33]
 Like two of the challenged quotas in the instant case, See nn.31 and 32, Supra, the Patterson quota apparently applied to both new hiring and promotions
 
 
 [34]
 A post-Patterson opinion of this court similarly interprets that case as not having decided the abstract validity of racial quotas. See White v. Carolina Paperboard Corp., 564 F.2d 1073, 1091 (4 Cir. 1977)
 
 
 [35]
 See, e. g., the majority and dissenting opinions in Rios v. Enterprise Ass'n. Steamfitters Local 638, 501 F.2d 622 (2 Cir. 1974), which address from opposing viewpoints the issue of a quota's compatibility with the Due Process and Equal Protection Clauses of the Constitution and with Title VII itself
 
 
 [36]
 The sole explanation offered by the court for including the hiring quotas in the remedial decree was that since in Patterson this court "placed its imprimatur on the establishment of quotas" in Title VII cases, "it must be regarded as settled law in this jurisdiction." As we have already indicated, this reading of Patterson is too broad
 
 
 [37]
 See Paragraph 40. Those who receive these reports will also be permitted to examine personnel records and other documents upon which the reports are based, and they may communicate with members of the class to satisfy themselves as to Stevens' compliance. Paragraph 48. Among the records available for this purpose are those which the employer is required to maintain concerning the name, race, sex and date of application of each job applicant, as well as the applications themselves which must be preserved for at least six months. Paragraph 7
 
 
 [38]
 The only stated justification for the quotas was the same one advanced for the hiring ratios. See n.36, Supra
 
 
 [39]
 The steps prescribed by the decree to remedy promotional discrimination are as rigorous and specific as those addressed to discriminatory hiring. Under the decree, the defendant's reliance upon word-of-mouth notice to supervisors of the existence of vacancies is completely abolished by the requirement of the decree that, for three working days prior to filling any opening, Stevens post in each plant the name, shift and department of every job in which there is a vacancy in that plant, together with an explanation that a transferring employee will not suffer a decreased rate of pay as a result of such a change. Sufficiently detailed descriptions of each such job are to be filed with the court, scrutinized by the plaintiffs, and posted with the notice of vacancy. The practice of permitting white officials to subjectively designate persons eligible to succeed to vacancies is replaced by a procedure by which any employee may bid in writing for an opening and by which Stevens must fill all openings according to objective, racially-neutral and job-related standards previously filed with the court and made available to any interested employee. In the event two persons are equally qualified for a vacancy, plant seniority, not subjective considerations is to govern the choice
 The defendant is prohibited from discouraging black employees from changing jobs and, once promoted, an employee is assured that if he is unable to perform the new job, efforts will be made to reassign him to a position equal in pay to his previous job. The employer must establish training programs to assist black employees in achieving the skills necessary to better jobs, and black employees are assured that they will benefit substantially from such programs; at least fifty percent of the trainees selected each year must be black (included at the suggestion of the appellant). Special provision is made for those clerically-minded employees who may not have been considered for a clerical job due to the confusion surrounding the type of application form they should have completed at the time they applied for work. They are to be invited to reapply and are to be offered future clerical vacancies which will be filled according to non-subjective criteria.
 
 
 [40]
 The plaintiffs agree that the North Carolina three-year statute of limitations, N.C.Gen.Stat. § 1-52, governs; they take issue solely with the court's conclusion as to when it was tolled
 Although this litigation is also prosecuted under 42 U.S.C. § 1981, it is now settled that a state statute of limitations is not tolled in a § 1981 employment discrimination action by the filing of the EEOC charge, but rather by the filing of the complaint in court. Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). See Patterson v. American Tobacco Co., 535 F.2d 257 (4 Cir. 1976). Back pay liability under that statute would thus at the most extend back three years from the filing of the class action complaint in this case and, accordingly, the reach of § 1981 is of no significance to the issue presented by the plaintiffs.
 
 
 [41]
 42 U.S.C. § 2000e-5(g) now reads in part:
 " * * * Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission * * *."
 
 
 [42]
 Because the filing of an EEOC charge of discrimination was a prerequisite to suit under Title VII before 1972, as it is now, allowing the statute of limitations to run between the filing of the EEOC charge and the filing of suit would unfairly penalize complainants for administrative delay in the processing of charges by shortening the period for which back pay is recoverable
 
 
 [43]
 For several reasons, the consequences of recalculating the period of monetary liability in accordance with this view do not appear to be great. First, the recalculation to extend the period affects only the size of potential back pay awards. It will not greatly increase the number of persons seeking relief, which is fixed by the definition of the certified class, nor will it redefine the conduct which has been adjudged discriminatory and for which compensation may be appropriate. See n.3, Supra. Second, the amount of the back pay awards for class members victimized by specific acts of the defendant, such as a discriminatory refusal to hire, is unaffected by this revision since the size of such recovery would in any event be calculated only prospectively from the date of the act. Given the unchallenged definition of the certified class and the evidence upon which judgment was entered, this date will not fall outside the three-year period prior to suit. The backward extension of the defendant's potential liability is relevant only as to cognizable claims resulting from any course of discriminatory conduct which began before the recalculated cutoff date and extended into the redefined period of limitations. Finally, because the period of limitations for purposes of back pay extends back from the date the first relevant EEOC charge was filed, that date will apparently vary for different types of claims. We note that the earliest charges in this case, filed on September 5, 1969 (the tolling date advanced by the plaintiffs), all apparently concerned only alleged refusals to hire black applicants for work. If, for example, the first charge of discrimination in job assignments was filed by a named plaintiff at some later time, then that date, not September 5, 1969, is the date on which the statute was tolled for all similar claims. See United States v. Georgia Power Co., supra, 474 F.2d at 925
 
 
 [44]
 Rule 23(d)(2) provides:
 In the conduct of actions to which this rule applies, the court may make appropriate orders:
 (2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action; * * *.