Curtis HOLSEY, Jackie L. Drakeford, Julius Frazier, Mynell Bennett, Linwood Edwards, Laura Harvey, Janie Hill, Appellees,

v.

ARMOUR & COMPANY, Appellant.

No. 83–1428.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 3, 1983.

Decided Aug. 20, 1984.

As Corrected Sept. 13, 1984.

Rehearing Denied Oct. 15, 1984.

W.R. Loftis, Jr., Winston-Salem, N.C. (W.F. Maready, Petree, Stockton, Robinson, Vaughn, Glaze & Maready, Winston-Salem, N.C., on brief), for appellant.

John T. Nockleby, Charlotte, N.C. (J. LeVonne Chambers, Chambers, Ferguson, Watt, Wallas, Adkins & Fuller, P.A., Charlotte, N.C., on brief), for appellees.

Before ERVIN and CHAPMAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.

BUTZNER, Senior Circuit Judge:

Armour & Company appeals from a judgment of the district court entered upon findings that the company had discriminated against black persons in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

Armour's 20 assignments of error encompass virtually every provision of the court's judgment, which afforded both individual and class relief.

This case is before us for the second time, and we now decide:

1) The district court complied with our mandate on remand.

2) The district court did not err in allowing certain class members to intervene and in adjudicating their claims in the first stage of the bifurcated trial.

3) The provisions of the judgment pertaining to discrimination and retaliation in violation of §§ 703(a) and 704(a) of Title VII, 42 U.S.C. § 2000e–2(a) and § 2000e–3(a) against the individual complainants are affirmed with the exception of those concerning Laura E. Harvey's claims about overtime work and switchboard training.

4) The class certification is vacated to the extent that it includes applicants affected by Armour's hiring practices and employees who sought promotion to office and management positions other than sales representatives and supervisors. In all other respects, the class certification is affirmed.

5) The findings of a pattern and practice of discrimination because of race with regard to promotions into sales and supervisory positions, and of retaliation in violation of § 704(a) are not clearly erroneous.

6) Relief granted Curtis Holsey and Julius Frazier must be modified to allow them retroactive departmental seniority based on their transfer date and not their date of hire. Injunctive relief granted incumbent employees who applied for positions other than sales or supervisory jobs is vacated. Relief granted job applicants is vacated. All other relief granted individual complainants and the class is affirmed.

7) The award of attorneys' fees is vacated and remanded to the district court for reconsideration.

## I

Curtis Holsey, Jackie L. Drakeford, and Julius Frazier filed charges with the Equal Employment Opportunity Commission, received right-to-sue letters, and timely commenced this class action against Armour, the Meat Cutters Union, and its Local 525. They alleged that the defendants' policies and practices had discriminated against them and the class members in hiring, promotions, layoffs, recalls, and other terms of employment because of their race.

The district court allowed Mynell Bennett to intervene as a plaintiff before trial. Bennett had filed a charge with the commission alleging discriminatory discharge and maintenance of racially separate jobs. She received a right-to-sue letter and timely moved for leave to intervene.

The district court certified a class. It held that Armour had discriminated against the complainants and the class because of their race in violation of § 703(a) and that it had retaliated against them in violation of § 704(a). It granted individual and class relief and awarded counsel fees. The court dismissed the claims against the union. Before entry of judgment, three class members who had presented claims at the trial moved to intervene as plaintiffs, and their motions were granted.

Armour appealed. We vacated the judgment with instructions to reconsider the findings of fact and conclusions of law and to clarify the allocation of evidentiary burdens in light of the Supreme Court's intervening decision in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *Holsey v. Armour & Co.*, 683 F.2d 864 (4th Cir.1982). After conducting proceedings on remand, the district court entered an amended judgment from which Armour now appeals.

## II

Before turning to the merits of this appeal, we address Armour's contention that the district court did not follow our mandate.

On remand, the district court conducted a hearing at which the plaintiffs proposed changes and responded to factual contentions that Armour had made on appeal. Armour had no specific proposals at the time, except a request that all adverse findings be reversed as error. The district court then directed both parties to file specific proposals for changes in the findings of fact, conclusions of law, and the judgment. The parties submitted lengthy responses which the court considered before it entered its amended judgment. After re-examining its findings of fact and conclusions of law, the court adopted suggestions from both parties where it found the changes were consistent with its opinion and accurate with respect to the evidence.

We conclude that the district court has complied with our mandate and its findings are demonstratively the result of the court's independent judgment. Also, the record establishes that the district court placed the burden of proof on the complainants in accordance with *United States Postal Service v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

## III

The district court found the following background facts about the company's business. Armour has operated a meat processing facility in Charlotte, North Carolina, since 1958. There are four production departments at the plant: a beef department, responsible for fabrication of beef; a sausage department, responsible for production of processed meats; a maintenance department, responsible for vehicle repairs and maintenance of equipment; and, an operations department, responsible for the distribution of products. In addi-

tion, the facility has office employees, including sales representatives.

Employees in the four production departments are represented by a union, which entered into collective bargaining agreements that establish seniority rights. Seniority governs job progression, daily replacement work, temporary and permanent layoff, and recall rights.[1]

Armour increased its production work force between 1969 and 1973 from approximately 90 to over 200 employees. Since 1974, however, sales have declined and the production work force has been cut back. In March 1980, when this case was tried, there were 133 production workers, of whom 50 worked regularly.

Armour filled sales and supervisory positions by transferring or promoting incumbent employees or by hiring new employees. Armour does not post vacancies or publish selection criteria for these jobs. The personnel are selected by a white managerial staff, applying subjective standards. Although a number of experienced black employees sought sales or supervisory positions, Armour managers had never compared the qualifications of these black employees with the white employees who were hired.

No black employee worked as a supervisor before Holsey, Frazier, and Drakeford filed charges with the commission in 1974. No black employee worked as a sales representative until August 1977, more than three years after plaintiffs filed charges with the commission. A company official explained to an employee that Armour did not hire black persons in the sales department because customers would not buy from them.

## IV

■ Contrary to Armour's contention, we conclude that the district court did not abuse its discretion in allowing class members Janie Hill, Linwood L. Edwards, and

Laura E. Harvey to intervene after trial and before the entry of judgment. Because Federal Rule of Civil Procedure 24 is silent as to what constitutes a timely application for intervention, the determination is left to the court's discretion. The court must consider all the circumstances in each case, not just to what point the suit has progressed. *NAACP v. New York*, 413 U.S. 345, 364–69, 93 S.Ct. 2591, 2602–04, 37 L.Ed.2d 648 (1973). The most important consideration in reviewing the decision is whether the delay prejudiced the parties. *See Hill v. Western Electric Co.*, 672 F.2d 381, 385–87 (4th Cir.1982).

Intervenors Hill, Edwards, and Harvey were witnesses at trial as well as class members. They suffered from the same practices challenged by the plaintiffs. Armour has not demonstrated any prejudice resulting from the intervenors' metamorphosis from class member witnesses into plaintiffs. *See Brown v. Eckerd Drugs, Inc.*, 663 F.2d 1268, 1278 (4th Cir. 1981), *vacated on other grounds*, 457 U.S. 1128, 102 S.Ct. 2952, 73 L.Ed.2d 1345 (1982). Whether they were allowed or denied intervention, their testimony was relevant and the court would be justified in making factual findings and stating conclusions pertaining to the discrimination they depicted.

■ Armour's second contention regarding the intervenors is that the district court erred in adjudicating their individual claims at the liability stage of the bifurcated trial. The company claims it should be allowed to rebut the individual claims at the second stage of the proceedings, relying on this court's decision in *Sledge v. J.P. Stevens & Co., Inc.*, 585 F.2d 625 (4th Cir.1978).

Armour had a full opportunity to defend against the intervenors' claims, and it introduced evidence in opposition to them. Moreover, at the first stage of the trial, the intervenors met a more rigorous burden of proof than would have been required had they waited until the second stage when

---

**1.** The agreements do not cover office employees (including sales), supervisors, or probationary employees.

they would receive the benefit of a finding of class-wide discrimination. *See Sledge*, 585 F.2d at 637.

Adjudicating the intervenors' claims at the first stage of the proceedings is not forbidden by *Sledge*. On the contrary, that case deals with the consequences of class members who did not litigate their individual claims at the first stage. In *Sledge*, we held that class members cannot be dismissed for omitting to prove their individual claims at the first stage when they had been led to believe that this would be the subject of the second stage. 585 F.2d at 637–38. Moreover, in *Cooper v. Federal Reserve Bank*, — U.S. —, —, 104 S.Ct. 2794, 2802, 81 L.Ed.2d 718 (1984), the Supreme Court held that "[w]hether the issues framed by the named plaintiffs before the court should be expanded to encompass the individual claims of additional class members is a matter of judicial administration that should be decided in the first instance by the district court."

## V

Seven employees allege disparate treatment. Their claims are discussed separately.

### Curtis Holsey

The district court found that because of Holsey's race and his efforts to challenge Armour's racial practices, Armour denied him the opportunity to exercise his bumping privileges in the sausage department to avoid lay-offs in the beef department.

The court found the following facts. Holsey was hired by Armour on December 1, 1969, and assigned to the operations department. At the time, black employees were concentrated in operations, and there were no black males in sausage and but one or two black employees in beef. After three weeks, Holsey was transferred to a clean-up job in beef, and subsequently he bid on better jobs in beef. His supervisor discouraged him from bidding on these promotions, but he was awarded the jobs because of his seniority. He was harassed in his new positions by being assigned duties that were not part of his job, was denied assistance in training and in the performance of his job, and was improperly disciplined. Holsey filed numerous grievances about the harassment, some of which were adjusted by Armour. In 1974, after Armour refused to let him grieve discrimination because of his race, Holsey filed a charge with the commission.

Permanent layoffs occurred in the beef department on three occasions: September 2, 1974; February 26, 1975; and February 24, 1976. The collective bargaining contract allowed employees who were permanently laid off and had five years' company seniority to bump junior employees permanently assigned to other departments, but they could not bump temporary employees. The bumping employee would then have recall rights established in the new department. Holsey had established five years' seniority on December 1, 1974, and he attempted to bump into the sausage department, establish recall rights there, and avoid further layoff. Armour officials told Holsey that no junior employees were working full time in sausage and that he could bump only junior employees in operations.

There was conflicting evidence as to whether three white and one black employee in sausage, all junior to Holsey, continued to work during the 219 days Holsey was on layoff. The court determined that Armour's explanation was unreliable and inconsistent with the documentary evidence. It found that the four junior employees were not working as "temporary replacements" in sausage. They had, in fact, worked during much of their "layoff." Even if they had been working on a day-to-day basis, Appendix I of the collective bargaining agreement provides that they are to be "laid off in preference to employees who have bumped into this department when the need for temporary replacement no longer exists." The black employee in sausage who continued to work while Holsey was laid off was not active in challenging Armour's discriminatory practices. This is consistent with Armour's pattern of

retaliation against Holsey for his efforts. The court found Armour's explanation for denying Holsey's request to bump into sausage to be pretextual.

Armour contends that a comparison of Holsey's timecards and those of the junior sausage employees dispute Holsey's testimony that these employees worked while he was laid off. The company also offered evidence that he had refused work on occasions and was under medical disability during layoff periods.

The timecards introduced by Armour indicate some of the junior white employees were not working when Holsey was laid off, but these timecards did not cover the entire period Holsey was on layoff. The district court noted in its findings that Holsey was out 219 days during layoffs in 1974, 1975, and 1976, while the four junior employees were laid off from 82 to 132 days. The district court could infer that at least some junior employees were working part of the time Holsey was on layoff. Similarly, the 53 days Holsey was out on medical disability between July 1975 and January 1976 do not explain why he was disqualified from bumping into sausage when he was available for work. Armour's testimony that Holsey refused work during this period was in dispute. Holsey denied that he had refused. The court weighed the credibility of the witnesses and believed Holsey.

■ The district court properly considered evidence of Armour's harassment of Holsey before he filed his charge with the commission as probative of the company's racial attitudes. In *United Airlines v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977), the Supreme Court stated that such time-barred acts "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue ...."

■■ Also, the district court correctly treated Holsey's claim that he was denied the opportunity to bump junior employees in sausage as disparate treatment. The court's decision does not rest on disparagement of the seniority system. Holsey proved by a preponderance of the evidence that Armour manipulated bumping to deny him and other black employees the privileges accorded by the seniority system in retaliation for their complaints about the company's discriminatory practices.

### Julius Frazier

■ Frazier was hired by Armour on July 21, 1969, and assigned to the operations department. He soon signed a job posting and was transferred to the beef department, where he worked continuously until the 1973 and 1974 layoffs. In August 1973, he was denied the opportunity to avoid layoff by bumping into sausage. In March 1974, he filed a charge with the commission complaining that he was discriminatorily denied his bumping rights. Frazier was laid off again for two weeks in December 1974 because he was not allowed to bump into sausage, although junior white employees in sausage continued to work. The district court found that Frazier was denied his contractual right to bump into sausage during the two-week period in 1974 because of his race and his efforts to exercise rights under Title VII.[2]

Frazier testified that two junior white employees, maintenance employee Kyle and sausage employee Newman, were allowed to work while he was on layoff. In rebuttal, an Armour official offered the same explanation that was given for denying Holsey an opportunity to bump into sausage—there were no vacancies.

The district court, noting numerous inconsistencies and conflicting documentary evidence, found Armour's explanations unreliable. Additionally, the district court properly considered evidence that Armour had historically limited opportunities for black males to work in sausage and that it harassed black employees who challenged

---

**2.** The district court ruled that Frazier was not discriminatorily denied bumping rights in 1973 because he had not yet established sufficient seniority. Frazier also failed to prove his claim that Armour discriminatorily denied him a promotion into sales.

the company's racial practices. Evidence of a general atmosphere of discrimination may be considered with other evidence bearing on motive in deciding whether the plaintiff has met his burden of showing the defendant's articulated reasons are pretexts. *Sweeney v. Bd. of Trustees of Keene State College*, 604 F.2d 106, 112–13 (1st Cir.1979). *See Furnco Construction Corp. v. Waters*, 438 U.S. 567, 580, 98 S.Ct. 2943, 2951, 57 L.Ed.2d 957 (1978).

### Jackie L. Drakeford

The district court found that Armour denied Drakeford supervisory and sales positions because of his race. The court also found that after Drakeford was promoted to supervisor, the company denied him equal status with white supervisors and harassed him in other ways, forcing him to terminate his employment in violation of § 704(a) of Title VII.

The court found that Drakeford was hired by Armour on June 17, 1969. Although he told his supervisor and department manager that he was interested in a foreman position in 1973, he was passed over on more than eight occasions between July 1973 and February 28, 1977, by junior white employees. The court noted that Armour had no black supervisor during this period.[3] Indeed, no black had been made a supervisor until Drakeford's promotion in 1977. The court found that Drakeford was more qualified than the junior white employees because of his seniority, past work performance, and overall experience with Armour.

Armour officials testified that no production employees, black or white, were considered for foreman positions after 1971 when the company instituted a trainee program limited to college graduates. This program was instituted in order to bring in persons who would stay with the company. Of the eight trainees hired between 1971 and 1974, all but two left the company after a short time, including four who were discharged. The remaining two transfer-

red to other jobs at Armour. None of the trainees selected was black.

The court found that the company never validated the criteria for selecting program candidates and terminated the program in 1975 when it became clear that the criteria and program didn't produce the desired results. Moreover, the record discloses that Armour in 1972 hired a white foreman who was not in the program. Between 1975, when the program was terminated, and 1977, when Drakeford was appointed, there was a foreman vacancy which Armour filled with a white appointee.

The district court also found that Drakeford was denied a sales position in 1975 and thereafter because of his race. The court found that Drakeford had expressed his interest in a sales position to the sales manager in 1975 and was told he would be considered for the next vacancy. Sales jobs are not posted, and an Armour official testified that one way a laborer could move into a salaried job was to talk to a supervisor. Drakeford was never asked to complete an application and did not do so.

Armour had no written standards for hiring sales representatives. An all-white staff selected new sales representatives, applying subjective standards. The district court found that Drakeford was available and qualified for a sales position, but sales vacancies were filled with white employees with no greater qualifications than Drakeford. Furthermore, no black employee or applicant had been hired as a sales representative until after this action was filed.

■ Armour's contention that Drakeford's testimony is insufficient to establish a prima facie case because he made only a "casual inquiry" regarding a sales position is refuted by *Teamsters v. United States*, 431 U.S. 324, 365–67, 97 S.Ct. 1843, 1869–70, 52 L.Ed.2d 396 (1977). There the Supreme Court held that a person who is interested in seeking a position but has not formally applied may be entitled to relief under Title VII. The Court reasoned that an employer's policy of discrimination "can

---

**3.** The parties and the court used the terms "fore- man" and "supervisor" interchangeably.

be communicated to potential applicants more subtly but just as clearly by an employer's actual practices—by his consistent discriminatory treatment of actual applicants, by the manner in which he publicizes vacancies, his recruitment techniques, his response to casual or tentative inquiries, and even by the racial or ethnic composition of that part of his work force from which he has discriminatorily excluded members of minority groups." 431 U.S. at 365, 97 S.Ct. at 1870.

In view of the district court's findings that Armour had no black employees in sales at the time of Drakeford's inquiry and had actively discouraged them from applying for sales jobs, Drakeford's claim is clearly within the *Teamsters'* standard for nonapplicants.

The district court made the following findings in support of its conclusion that Drakeford was constructively discharged by Armour in violation of § 704(a). Drakeford was promoted to supervisor on February 22, 1977, after filing a charge with the commission and several days before this action was filed. He was put on a night shift so that a white supervisor could get the day shift, although Drakeford was hired to replace a day-shift supervisor. The shift was adjusted a second time to accommodate another white supervisor. The general foreman at Armour granted leave to employees supervised by Drakeford without advising him. Despite complaints to his superiors, the problem continued. His request for a transfer was rejected by the company. As a result of the degrading treatment, he left Armour on November 28, 1978. The district court found that the company knew Drakeford was denied equal status as a supervisor and was subjected to harassment but failed to correct these practices. It held that "the employment conditions imposed by the company forced Drakeford to terminate his employment in violation of section 704(a)."

Armour argues that it must be shown that the employer acted with the intent to force the employee to resign in order to establish constructive discharge. The company claims that there is no evidence that it sought to make Drakeford quit his job.

The elements of a constructive discharge are stated in *J.P. Stevens & Co., Inc. v. NLRB,* 461 F.2d 490, 494 (4th Cir.1972), as follows: "Where an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job ... the employer has constructively discharged the employee ...." A constructive discharge violates § 704(a) when the record discloses that it was in retaliation for the employee's exercise of rights protected by the Act.

■ To act deliberately, of course, requires intent. But direct evidence of intent is unnecessary. Circumstantial proof suffices. *United States Postal Service v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 1481 n. 3, 75 L.Ed.2d 403 (1983). The fact that higher officials knew of Drakeford's untenable position and took no action to correct it supports the district court's finding that the employment conditions were "imposed by the company." This finding satisfies the requirement of deliberateness.

■ The district court's findings also satisfy the other requirements of a constructive discharge in violation of § 704(a). The company refused to appoint Drakeford a supervisor until after he filed a charge with the commission. He was then systematically harassed and denied equal status with white supervisors. The court's finding that these conditions forced him to resign is not clearly erroneous.

### Linwood L. Edwards

■ The district court held that Linwood Edwards was denied a supervisory position because of his race.

The court made the following findings. Edwards was hired by Armour in 1949 at its Asheville facility and subsequently promoted to supervisor. When the plant closed in 1969, Edwards was transferred to the Charlotte plant and assigned as a laborer. Armour's practice had been, and continued to be throughout this litigation, to transfer employees from closed facilities to

other facilities in basically the same job position. For example, three white supervisors from closed plants transferred into the Charlotte facility and were brought in as supervisors. Edwards requested a supervisory assignment after his transfer but was passed over for junior white employees who were hired as, or promoted to, supervisors. Armour had no black supervisor until 1977, when Drakeford was promoted after filing his charge with the commission. Edwards had the experience and knowledge of Armour's operation to qualify him for a supervisory position at the time he was transferred to Charlotte and when job vacancies occurred between 1971 and the trial.

Armour contends that the court ignored the legitimate nondiscriminatory reasons it offered and that the finding of pretext is clearly erroneous.

On the contrary, the court's findings of fact specifically addressed the testimony of Armour officials and found that the explanations were not credible. One reason offered by an official for not promoting Edwards was that his supervisory experience in Asheville occurred in a nonunion plant and the Charlotte plant was unionized. The company, however, continued to bypass him in favor of junior white employees with little or no union experience even after Edwards had accumulated several years union experience at Charlotte. The official also testified that Edwards wasn't offered a supervisory position because he didn't think he would have taken it. Finally, he testified that Edwards was not selected because of his "interaction within the plant, his ability to communicate, take instructions," and because he lacked aggressiveness. The district court found that Edward's satisfactory performance as a supervisor in Asheville showed that this "after-the-fact" explanation was false.

### Mynell Bennett

The district court found that Armour prevented Bennett from acquiring seniority because of her race and that Armour discharged her in violation of § 704(a). Arm-

our contends that these conclusions are clearly erroneous and that Bennett's claim is barred by laches.

The court made the following findings of fact. According to the collective bargaining agreement in effect in 1971, a new employee was classified as a probationary employee until he or she worked 30 days during a consecutive 60-day period. At that time the employee acquired a permanent status, with seniority and its concomitant rights. Probationary employees were called in to work on a daily or weekly basis when needed by a supervisor. Although no standards governed the supervisors' discretion in calling probationers to work, the practice was to call in the most senior employee.

Bennett started working in Armour's sausage department as a probationary employee in July 1971. In August, Armour hired three white women from the closed Swift & Company plant. These women, although junior to Bennett, were called in over her. Armour also employed white students to work during the summer, at the same time Bennett was trying to establish seniority. As a result, Bennett was unable to acquire permanent status after six months of probationary employment.

In January 1972, Bennett asked her supervisor if the company had refused to call her to work because of her race or her performance. The supervisor assured her that her performance was acceptable, but after the conversation she was not called to work. Two weeks later, upon inquiry, she was told she had been discharged.

The court found that Bennett was qualified to perform the work and that the junior white employees were called in over her because of her race. It also found that she was discharged in retaliation for complaining about Armour's discriminatory refusal to call her to work and because of her race.

Armour claims that the probationary employees from Swift were called in over Bennett because their experience at Swift and their familiarity with the machines in the sausage department was of value to the

company. The court specifically found this explanation not credible. According to an Armour official, an employee hired into the company from Swift would not be given any preference over employees already working at Armour. The official also testified that probationary employees were evaluated during the probationary period by a subjective determination on the part of their supervisor. No written or objective comparison between the Swift employees and incumbent Armour employees was made.

■ The court's finding that Armour discharged Bennett in retaliation for her inquiry as to whether she was not called to work because of her race is supported by testimony and documentary evidence. When Bennett made the inquiry in January 1972, she was assured by her supervisor that her work was satisfactory. Documents in her personnel file support this evaluation. After Bennett made her complaint, she was never called in again and was fired with no explanation. In a North Carolina Employment Security Commission form completed by Armour, the company indicated that she was discharged in January 1972 for unsatisfactory performance. The court correctly concluded that the discharge was a violation of the § 704(a) "opposition clause." Bennett's inquiry as to whether she had been prevented from acquiring seniority because of her race constitutes opposition under the statute. *See Berg v. La Crosse Cooler Co.*, 612 F.2d 1041 (7th Cir.1980).

■ Finally, Armour contends that Bennett's claims are barred by laches because she waited four and a half years before bringing suit, and the company was prejudiced because Bennett's supervisor had died before trial. Bennett filed a charge with the commission on January 27, 1972. The commission investigated the charge and on August 25, 1976, issued a determination of reasonable cause. When conciliation efforts failed, Bennett received a right-to-sue letter on May 17, 1977. Bennett then moved to intervene in this proceeding on June 2, 1977.

In order to apply laches, there must be a finding that the plaintiff delayed inexcusably in filing suit and that the delay resulted in undue prejudice to the defendants. We hold that Bennett's decision to rely on the commission's administrative process before initiating a private suit is not inexcusable delay. *See Bernard v. Gulf Oil Co.*, 596 F.2d 1249, 1256–58 (1979), *adopted*, 619 F.2d 459, 463 (5th Cir.1980) (en banc).

*Janie Hill*

■ The district court found that Hill was denied the opportunity to establish seniority because of race.

In addition to the findings described under Bennett's claims, the court made the following findings of fact. Hill was hired by Armour in 1971 as a probationary employee in the sausage department. She was passed over for work in favor of junior white employees, including the three women who had been hired from Swift. As a result, Hill was unable to acquire permanent status and seniority until March 1972, after the junior white employees from Swift had established seniority. Armour's assertion that the Swift employees were more efficient than Hill was not credible, given the company's lack of objective measures of efficiency, its official's testimony that the Swift employees wouldn't be given preference over incumbent employees, and Hill's satisfactory performance at Armour. The district court credited Hill's testimony and found that the company intentionally discriminated against her because of her race.

Armour contends that the court's conclusion is clearly erroneous because the evidence demonstrates that no racial motive was involved in its decision to call certain junior white employees over Hill. The existence of discriminatory intent, according to Armour, is belied by the fact that black employees sometimes acquired seniority immediately and white employees sometimes took a year to acquire seniority.

Armour's argument does not expose any error in the district court's judgment. The

district court's findings of intentional discrimination were not based on a comparison of the length of time black and white employees remained probationers. The findings were based on the fact that the probationary periods of Bennett and Hill were unlawfully extended because when Armour assigned work, it favored junior white employees with no superior qualifications.

### Laura E. Harvey

The district court held that Armour discriminated against Harvey in violation of § 703(a) by depriving her of equal status in her supervisory position. The company also denied her a sales position because of her race, and, when she complained about Armour's racial practices, she was harassed in violation of § 704(a).

The court made the following findings of fact. Harvey was hired by Armour as a keypunch operator in January 1973. She was the first black employee in data processing and only the second ever employed in the administrative office. In 1979, she was promoted to a supervisory position, replacing a white employee as lead key operator. Despite the fact that her predecessor had supervised both black and white employees, Harvey was told that the white employees would be supervised by the data processing manager because they would not take instructions from her. In March 1979, Harvey resigned because this arrangement created problems with work assignments among the employees. In May 1979, she returned to work as lead key punch operator but without supervisory duties.

■ The district court properly concluded that Armour violated Title VII by preventing Harvey from supervising white employees because they did not wish to take orders from a black person. Section 703(a)(2) provides that it shall be an unlawful employment practice for an employer "to limit, segregate, or classify his employees ... in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely

affect his status as an employee, because of such individual's race ...." Racial segregation of the employees Harvey supervised because of her race limited her employment opportunities as a supervisor and adversely affected her status. *Cf. Rogers v. EEOC*, 454 F.2d 234, 237–38 (5th Cir. 1971); *Allen v. City of Mobile*, 331 F.Supp. 1134, 1144 (S.D.Ala.1971).

■ In regard to the claim pertaining to a sales position, the district court found that Harvey applied for sales jobs in 1976, 1977, and 1978. The court found that Harvey was qualified to work in sales. She was highly recommended by her supervisor for her attitude, motivation, and performance. In a 1977 performance evaluation, her supervisor noted that her sales knowledge was underutilized. The court found that Armour had rejected Harvey for sales because of her race. Despite Armour's explanation that there were few sales openings from 1976 to 1978 and, in most cases, jobs were awarded to persons with significant prior sales experience, the court found convincing Harvey's evidence that the company had a practice of excluding blacks from sales jobs. Harvey's supervisor told her the company didn't hire black salespersons because the customers wouldn't buy from them. An Armour official who participated in hiring sales employees between 1975 and 1978 testified that a high school education was the only established criterion for hiring sales persons. Harvey had a high school diploma as well as the sales knowledge and other attributes noted in her performance evaluation. In the face of evidence that the company did not hire black sales representatives, Armour's rebuttal on the basis of relative qualifications does not demonstrate that the district court's findings are clearly erroneous. *See EEOC v. Ford Motor Co.*, 645 F.2d 183, 188 n. 3 (4th Cir.1981), *rev'd in part on other grounds*, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982).

■ There is one aspect of Harvey's claim that is not supported by the record. The evidence does not disclose that Armour

violated § 704(a) by retaliating against her because of any complaint. She was not assigned overtime work or denied switchboard training in retaliation or because of her race. There is no evidence that any white employee requested the switchboard training and received it. There was only one switchboard position at Armour, and it was occupied by a white woman who was hired the same year as Harvey and remained in the position at the time of trial.

Consequently, we vacate that portion of the district court's judgment dealing with Harvey's complaint about overtime work and switchboard training. Because the findings about these claims were not necessary to the findings that Armour discriminatorily denied Harvey equal supervisory status and a sales position because of her race, affirmance of those claims is not affected.

### Summary

With respect to a disparate treatment claim, *United States Postal Service v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983), reiterates:

> The "factual inquiry" in a Title VII case is "whether the defendant intentionally discriminated against the plaintiff." ... In other words, is "the employer ... treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.' "

Thus, when the evidence introduced by both the employee and the employer has been admitted, the ultimate question is "whether the [employer] intentionally discriminated against the [employee]." 103 S.Ct. at 1482. The burden of proving intentional discrimination is on the employee. As in any other case, intent, a state of mind, is a fact that can be proved by indirect or circumstantial evidence. 103 S.Ct. at 1482–83. A district court's finding of intentional discrimination on account of race, or lack of this discrimination, is encompassed by Federal Rule of Civil Procedure 52(a). A court of appeals is obliged to accept the finding unless it is clearly erroneous. *Pullman-Standard v. Swint,* 456

U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

These precepts have governed our review of the district court's findings about the seven individual claimants. With the exception of Harvey's overtime and switchboard claims, we conclude that the district court's findings that Armour intentionally discriminated against the complainants because of their race are not clearly erroneous. We also conclude that the court's findings of retaliation in violation of § 704(a) are not clearly erroneous. The provisions of the judgment pertaining to the individual claims, except as noted above, are affirmed.

### VI

Armour assigns error to the district court's judgment pertaining to the class on both substantive and procedural grounds.

As amended on remand, the court's certification of the class included:

> All black applicants for employment and black employees of the Company's Mecklenburg County, North Carolina facility who have been adversely affected, at any time since July 27, 1971 (six months prior to Bennett's charge filed with the EEOC), by the Company's racially discriminatory employment practices involving promotions or hiring into Office and management positions, including Sales and foreman positions, and retaliation for having opposed discriminatory practices or having exercised rights protected under Title VII.

The district court found a pattern and practice of retaliation in violation of § 704(a). It also found that the complainants had demonstrated a pattern and practice of limiting black candidates to certain jobs, totally excluding them from supervisory and sales jobs, and treating them dif-

ferently from white applicants and employees because of their race. It found that although black candidates were available and qualified for sales and supervisory positions, and vacancies existed, Armour did not select them because of their race.

The findings with respect to class discrimination were based on evidence of specific instances of intentional discrimination and statistical evidence. The district court accepted plaintiffs' expert testimony that between 1965 and Drakeford's promotion in 1977 Armour brought in 37 supervisors. Twenty-seven were promoted from within and ten were new hires. Black persons constituted 25.11% of the outside available workforce, yet none was hired. As for sales, between 1965 and Ennis Graves's employment in August 1977, Armour promoted or hired 64 sales representatives. Plaintiffs' expert used the data on these employees to determine the qualifications expected of sales representatives. Between 1971 and the trial date, qualified black persons constituted 8.69% of the external and 20.71% of the internal available workforce. Only one black person was hired as a sales representative despite 23 sales vacancies between 1971 and trial.[4]

Armour offered several explanations for these hiring patterns through one of its witnesses. The district court, however, refused to credit his testimony, finding that his admitted misrepresentations, decorum, and the conflicting documentary evidence made his testimony unreliable. The court also noted nine instances in the record where Armour officials admitted the company had no explanation for its actions. Consequently, the district court held that plaintiffs had established a pattern and

practice of discriminatory treatment towards members of the class.

Armour claims that the finding of classwide discrimination was unsupported. It asserts that the plaintiffs' statistical evidence was flawed and, without any statistical showing of underutilization, there remained only "evidence of isolated instances" of discrimination.

First, we note that the complainants' testimony as to instances of discrimination establish more than isolated or "accidental" discriminatory acts. *See Teamsters*, 431 U.S. at 336, 97 S.Ct. at 1855. The testimony of both employees and company officials that the district court relied upon in concluding classwide and individual liability clearly established a pattern of intentional discrimination. For example, Harvey testified, without rebuttal from Armour, that she was informed by her manager that black people were not hired in sales because customers wouldn't buy from them. Also, Armour's practice of not posting sales or supervisory vacancies, and its practice of using a white managerial staff who relied on unwritten subjective criteria for making promotion decisions, support a finding of a pattern and practice of classwide discrimination. Such evidence provides a substantial basis upon which a district court may infer that discrimination was the regular practice.

The district court rejected Armour's expert testimony that the sample of supervisors and sales representatives between 1971 and 1977 indicates no discrimination in the promoting or hiring of black employees.[5] It found that (1) the sample

---

**4.** The district court rejected Armour's contention that Virginia Davis, a black female employee who worked in the sales office as a telephone clerk between December 1976 and February 1977, was the first black employee with sales duties. Relying on the testimony of an Armour official that the first black sales representative was hired in August 1977, the district court found that Davis had only clerical duties.

**5.** Armour's expert testified that the underrepresentation of black employees in sales and supervisory positions came within one standard devi-

ation, an acceptable margin of disparity. This is only true, however, if promotions and hires made after commencement of this action are included. We find no error in the fact that the district court minimized the significance of evidence of Armour's postcomplaint hiring and promotion of black employees. *See EEOC v. Ford Motor Co.,* 645 F.2d 183, 197 (4th Cir.1981), *rev'd in part on other grounds,* 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982); *Rich v. Martin Marietta Corp.,* 522 F.2d 333, 346 (10th Cir. 1975).

for the period was too small to establish a reliable statistical pattern; (2) Armour's availability data was based on a static work force of employees as of December 31, 1977, with no consideration of the qualifications or work experience of employees actually hired; and, (3) after evaluating the manner and decorum of both parties' expert witnesses, the plaintiffs' availability and utilization data was more reliable.

We find no error in the district court's decision to reject Armour's statistical analysis and accept plaintiffs' expert testimony. Armour's argument that the district court improperly considered hiring data between 1965 and 1977—well before June 27, 1971, when the company's potential liability began to run—might be persuasive if the company had virtually no vacancies in sales or supervisory positions between June 27, 1971, and March 4, 1977, when this suit was filed. It might then be argued that low turnover and a decrease in hiring account for the statistical disparities after 1971, rather than post-charge discrimination. The record shows, however, that there were 15 new vacancies in sales and 18 in supervisory positions during this period. The practices apparent before 1971 are consistent with the pattern during the relevant period.[6] No black persons were hired to fill these positions except for Drakeford, who was promoted four days before the suit was filed and one month after the commission issued him his right to sue letter. Job offers made after learning of a charge "are entitled to little weight." *EEOC v. Ford Motor Co.*, 645 F.2d 183, 197 (4th Cir.1981), *rev'd in part on other grounds*, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982).[7]

Statistical proof in Title VII cases must be evaluated in light of "the surrounding facts and circumstances." *Teamsters v. United States*, 431 U.S. 324, 340, 97 S.Ct. 1843, 1857, 52 L.Ed.2d 396 (1977). As Jus-

tice Rehnquist made clear in a separate concurring opinion in *Dothard v. Rawlinson*, 433 U.S. 321, 338, 97 S.Ct. 2720, 2731, 53 L.Ed.2d 786 (1977): "It is for the District Court, in the first instance, to determine whether these statistics appear sufficiently probative of the ultimate fact in issue .... In making this determination, such statistics are to be considered in light of all other relevant facts and circumstances." In view of Armour's method of making promotion decisions during the relevant period and the evidence of specific discriminatory acts, we cannot say that the district court was clearly erroneous in finding a pattern and practice of intentional discrimination against the class.

■ Similarly, because of Armour's pervasive harassment and retaliation against black employees who sought or achieved advancement or exercised rights protected by Title VII, we conclude that the district court's finding of a pattern and practice of retaliation is not clearly erroneous.

## VII

In order to maintain a class action, the requirements of Federal Rule of Civil Procedure 23 must be met. *General Telephone Co. v. Falcon*, 457 U.S. 147, 156, 102 S.Ct. 2364, 2370, 72 L.Ed.2d 740 (1982); *Stastny v. Southern Bell Tel. & Tel. Co.*, 628 F.2d 267, 273 (4th Cir.1980). In reviewing the final class certification, the appellate court views the entire record to determine if the trial court erred in its certification. *Stastny*, 628 F.2d at 276.

Armour claims that the class as certified fails to meet the prerequisites of commonality, typicality, numerosity, and adequacy of representation. The company further contends that the district court erred in including victims of retaliation and appli-

---

6. Moreover, because the evidence shows there was little change in Armour's employment practices being challenged, the precharge statistical evidence is relevant. *See Hazelwood School Dist. v. United States*, 433 U.S. 299, 309 n. 15, 97 S.Ct. 2736, 2742 n. 15, 53 L.Ed.2d 768 (1977).

7. After this action was filed, Armour promoted a black employee to supervisor and hired a black person as a salesman.

cants, because they are inappropriate for class treatment.

■ Preliminarily, we note that inclusion of "office and management positions" in the certification comprises more jobs than are justified by the evidence. While it is true that sales jobs are included in office positions and supervisory jobs may be considered management positions, the broad reference to office and management positions encompasses jobs for which no plaintiff or intervenor presented evidence of racially discriminatory practices. To clarify the certification, it must be amended to include only promotions into sales and supervisory positions.

■ Armour's contention that the district court erred in certifying outside applicants for sales and supervisory positions when the class representatives were employees who sought promotions into these jobs presents a more difficult question. In *General Telephone Co. v. Falcon*, 457 U.S. 147, 157–58, 102 S.Ct. 2364, 2370–71, 72 L.Ed.2d 740 (1982), the Supreme Court rejected the practice of across the board certification and held that the class claims must be fairly encompassed within the representatives' claims. *Falcon* noted that the commonality and typicality requirements of rule 23(a) might be satisfied if there were "[s]ignificant proof that an employer operated under a general policy of discrimination" and "the discrimination manifested itself in hiring and promotion in the same general fashion, such as through entirely subjective decisionmaking processes." 457 U.S. at 159 n. 15, 102 S.Ct. at 2371 n. 15.

Applying *Falcon*, the district court found that the standards for selection to these positions are the same for incumbent employees and outside applicants. At trial, Armour officials testified that employees and outside applicants were required to complete an application for employment and that employees were given no preference over others. Also, entirely subjective criteria were applied to employees and outside applicants seeking sales or supervisory jobs.

The plaintiffs' claims regarding the promotion of black employees into sales and supervisory jobs and class claims regarding the hiring of black applicants into these jobs overlap on many important issues of proof. We believe, however, that there is a significant omission in the district court's findings. Applying *Falcon*, we are unable to affirm single class treatment for both promotions and hiring claims because the district court made no finding that the supervisors who made the challenged promotions decisions were the same persons who made hiring decisions. Consequently, there is no evidence that the officials who selected outside applicants for the sale and supervisory jobs were motivated by racial prejudice. *See Falcon*, 457 U.S. 147, 162, 102 S.Ct. 2364, 2373, 72 L.Ed.2d 740 (Burger, C.J., concurring in part, dissenting in part). Although the certification question is a close one, we conclude that the significant proof for single class treatment required by *Falcon* is lacking in this case, and thus the plaintiffs cannot adequately represent the outside applicants for sales and supervisory positions. Additionally, we note that the lack of identity of officials who were responsible for hiring undercuts a finding that the company engaged in a pattern and practice of racial discrimination against outside applicants. *See Lilly v. Harris-Teeter Supermarket*, 720 F.2d 326, 338 (4th Cir.1983). This observation, however, in no way affects the proof of a pattern and practice of discrimination against incumbent employees who sought a promotion into sales and supervisory positions.

In all other respects, we conclude that the record supports the district court's determination of class action status. The plaintiffs' pleadings and evidence are consistent with a finding of commonality. Both class claims and individual claims were established by a showing of intentional discrimination in promotions, bolstered by statistical evidence.

■ We cannot accept Armour's contention that harassment and retaliation

claims are not susceptible of class treatment because they are too individualized. The plaintiffs established a general practice of retaliation against employees who opposed discriminatory practices or exercised rights protected under Title VII, in violation of § 704(a). Despite the presence of individual factual questions, the commonality criterion of rule 23(a) is satisfied by the common questions of law presented. In this case, the utility of the class action device would be destroyed by requiring the plaintiffs to bring separate claims of retaliation. *See Int'l Woodworkers v. Chesapeake Bay Plywood*, 659 F.2d 1259, 1269–70 (4th Cir.1981); 7 Wright and Miller, *Federal Practice and Procedure* § 1763 (1972 and Supp.1983).

■ The complainants' claims are typical of the plant-wide discriminatory practices they challenge. Drakeford and Harvey were discriminatorily denied sales positions. Drakeford and Edwards were discriminatorily denied supervisory positions. Finally, Holsey, Frazier, Drakeford, and Bennett[8] were found to have been victims of retaliation for exercising their rights under Title VII. Thus, at least one representative is a qualified member of the class of employees denied promotions in sales and supervisory positions and subjected to retaliation. *See* 7 Wright and Miller, *Federal Practice and Procedure* § 1761 at 586–87 (1972). The complainants alleged and established that they personally were harmed by these practices. They meet the typicality criterion of rule 23(a) and the requirement for fair and adequate representation.[9]

■ The final requirement for certification, numerosity, was satisfied by the plaintiffs. The district court found that Armour employed between 46 and 60 black employees annually since 1971, and this large number of employees potentially affected by Armour's challenged practices made joinder impracticable. Armour contests the figures used by the district court, claiming that the relevant number is the total of all supervisory and sales vacancies during the time period, which is 34. Armour further contends that the more realistic figure is 6 or 7, because of the 34 vacancies only 6 or 7 positions might have been awarded to blacks if the availability data used at trial applied.

We cannot accept this method of estimating the size of a class for purposes of rule 23(a)(1). Contrary to Armour's assertion, this court's opinion in *Kelley v. Norfolk & Western Ry.*, 584 F.2d 34 (4th Cir.1978), does not mandate Armour's computation. *Kelley* involved complaints of a promotion system at a facility where there were 67 black employees, all lived in the same area, and the plaintiffs identified only 8 black employees who qualified for promotion. In the instant case, there were considerably more black employees who could have been injured by the challenged practices, and their identity could not be established at the liability stage. Moreover, *Kelley* establishes that there is no mechanical test for numerosity and the determination "turns on the nature of the claim of discrimination asserted by the plaintiffs and the number of persons who could have been injured by such discrimination." 584 F.2d at 35. *See generally* 7 Wright & Miller, *Federal Practice and Procedure* § 1762 at 602–03 (1972). The determination of numerosity is a discretionary matter, and, finding no abuse, we affirm the district court's decision. *See Cypress v. Newport News General & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir.1967).

## VIII

■ Armour objects to allowing Holsey and Frazier to establish permanent seniori-

---

8. Armour asserts that Bennett is not an adequate representative of the class because she had limited exposure to Armour as a probationary employee for six months and then was discharged. This reasoning would create the anomalous result that an employer could eliminate a potential representative of employees merely by discharging a complaining employee. We therefore reject this argument.

9. Armour does not contend that plaintiffs' counsel were inadequate representatives. Thus, this aspect of rule 23(a)(4) is not at issue.

ty in the sausage department, and using their date of hire as their departmental seniority date. It also protests that the judgment contains unreasonably vague injunctive relief, contrary to the requirements of Federal Rule of Civil Procedure 65(d).

We conclude that retroactive seniority is the appropriate remedy to be awarded to Holsey and Frazier. *See Franks v. Bowman Transp. Co., Inc.*, 424 U.S. 747, 762–70, 96 S.Ct. 1251, 1263–66, 47 L.Ed.2d 444 (1976). The record, however, does not support using their date of hire as their departmental seniority date. Under the terms of the collective bargaining contract, if Armour had allowed them to bump into sausage, they would have had departmental seniority dating from their transfer. The relief accorded Holsey and Frazier should be modified to this extent.

■ The court has the duty to render a decree which will eliminate racially discriminatory effects of the past and bar such discrimination in the future. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975); *Sledge v. J.P. Stevens & Co., Inc.*, 585 F.2d 625, 643–44 (4th Cir.1978). The district court properly fashioned injunctive relief to protect the plaintiffs and class members from future discriminatory and retaliatory acts like those established at trial. It drafted the decree with sufficient specificity to give Armour fair notice of the conduct that is being prohibited. We note, however, that because the court's finding of classwide discrimination against outside applicants lacks evidentiary support, that portion of the judgment enjoining Armour from discriminating in hiring is vacated.

### IX

■ Because we have vacated part of the judgment, the district court must reconsider the award of attorneys' fees. We therefore vacate the award and remand this issue for a determination of the proper amount in accordance with *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), and *Blum v. Stenson*,

—— U.S. ——, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). The award should include a reasonable fee for the appellees' attorneys on appeal with respect to those issues on which the judgment has been affirmed. Because appellees have substantially prevailed on appeal, they shall recover their costs.

The judgment is affirmed in part, vacated in part, and the case is remanded for further proceedings consistent with this opinion.